**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MAHANT DENTAL PLLC D/B/A COTTON WOOD DENTAL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 3:24-cv-01791-G** |
| **vs.** | § | |
| | § | |
| **MASSACHUSETTS BAY INSURANCE COMPANY,** | § | |
| | § | |
| **Defendant.** | | |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE:

Plaintiff Mahant Dental PLLC d/b/a Cotton Wood Dental ("Plaintiff") files this Brief in Support of its Response to Defendant's Motion for Summary Judgment. In support, Plaintiff would respectfully show the Court as follows:

## INTRODUCTION AND BACKGROUND

On August 13, 2022, Mahant Dental's property (the "Property") suffered severe water damage as a result of a valve failure in the building's water supply line.[1] The office quickly filed a claim with Massachusetts Bay Insurance Company ("Mass Bay").[2] Beyond these bare recitals, the Parties do not agree on the many of the facts. Although the insurance policy provides coverage for interior repairs and ongoing rent obligations during the period of restoration[3], Mass Bay delayed and denied these payments, positing that a provision in Plaintiff's tenant lease between Plaintiff and its third-party landlord absolved Mass Bay of its obligations under its own policy and advising Plaintiff not to pay its rent until the landlord repaired the space. Mass Bay's interpretation ignored the policy's plain language and effectively left the insured without critical funds necessary to maintain occupancy. As a result of being unable to pay rent, the dental practice was evicted from its long-standing primary location and permanently closed.

Because a fact issue exists on Plaintiff's breach of contact claim and its Chapter 541 and 542 claims, Mass Bay's motion for summary judgment must be denied.

## SUMMARY OF THE ARGUMENT

The summary judgment evidence raises more than a genuine issue of material fact that a valve failure – a covered peril – occurred during the policy period, on or about August 13, 2022, which caused substantial damage to the Property. Mass Bay partially denied and delayed payment for the covered damage, and Plaintiff has demonstrated that its covered losses exceed Mass Bay's

---

[1] Dkt. 1-4, Plaintiff's Original Petition at ¶¶ 7-8.
[2] Dkt. 1-4, Plaintiff's Original Petition at ¶¶ 10.
[3] See Dkt. 20-1, Exhibit A, Policy provision 5 (Additional Coverages) (g)(2)(a) provides coverage for extra expense to continue operations.

prior payments on the claim. Thus, the evidence shows that Mass Bay breached the Policy contract with Plaintiff and caused damages by not fully paying benefits under the Policy.

Before the date of loss, Mahant Dental owner Megha Patel planned to expand her business by purchasing a second location.[4] The sudden loss of her practice forced her to expedite the acquisition and she began practicing out of the new site. Mass Bay previously contended that it is only liable for business interruption losses during period of transition to the new office because Plaintiff had resumed operations.[5] Now, Mass Bay concedes that Plaintiff "never resumed at a new permanent location"[6] and instead justifies its insufficient payment by arguing that Plaintiff *should* have repaired the damage to the Property by December of 2022. This position is belied by simple fact that Mass Bay did not issue payment for repairs to the Property until February of 2023.[7] Plaintiff could not and should not have completed repairs to the Property before December of 2022 when Mass Bay did not provide the funds to perform them until months later. Moreover, because Mass Bay's breach directly resulted in the permanent closure of the primary location, the insured is entitled to policy limits for lost business income—reflecting a full year of lost revenue, as expressly contemplated by Mass Bay's business interruption coverage.

Further, the summary judgment evidence shows that Mass Bay conducted an unreasonable investigation and ignored evidence of coverage when it denied Plaintiff's claim. In the face of such unreasonableness, Mass Bay may not shield itself from liability for its bad faith by simply claiming

---

[4] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit E, Deposition of Rinkesh Desai at APPX 281.
[5] Plaintiff's Exhibit A, Defendant's Expert Report of Louis G. Fey Jr. at *18 (characterizing the opening of the second practice location as a "resumption of operations" and opining that the existence of the second location reduces the period for which Mass Bay owes BI).
[6] Dkt. 19, Def.'s MSJ at *11.

this is a bona fide coverage dispute. As such, the evidence shows that Mass Bay violated Chapter 541 of the Texas Insurance Code.

Finally, Plaintiff has put forth sufficient evidence that Mass Bay has made insufficient payments to Plaintiff under the Policy. Thus, there is a genuine issue of material fact that Mass Bay violated Chapter 542 of the Texas Insurance Code. The Court should deny Mass Bay's motion for summary judgment in its entirety.

## LEGAL STANDARD

To succeed on a traditional motion for summary judgment, Mass Bay bears the burden of establishing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9] The resolution of a genuine dispute of material fact "is the exclusive province of the trier of fact and may not be decided at the summary judgment stage."[10] Thus, the Court must not weigh evidence or make credibility findings, and it construes all facts and reasonable inferences in favor of Plaintiff.[11] As the party moving for summary judgment, Mass Bay "always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact."[12] If Mass Bay meets its burden, the burden shifts to Plaintiff to show why the Court should not grant summary judgment.[13]

---

[8] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[10] *Ramirez v. Landry's Seafood Inn & Oyster Bar*, 280 F.3d 576, 578 n.3 (5th Cir. 2002).
[11] *See Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328–29 (5th Cir. 2017).
[12] *Celotex Corp.*, 477 U.S. at 323.
[13] *See Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

Texas courts have "long recognized that the Texas Constitution confers an exceptionally broad jury trial right upon litigants."[14] To that end, in considering an insurer's summary judgment, the Court "may only grant summary judgment where there is no conflict in the evidence."[15]

## ARGUMENT AND AUTHORITIES

### A. The Evidence Shows Mass Bay Breached the Contract when it Partially Denied Plaintiff's Claim for Damages.

Under Texas law, "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[16] Here, the parties agree that the Property was covered for water damage by a valid policy contract from May 1, 2022 through May 1, 2023, inclusive of the Date of Loss, August 13, 2022.[17] They only dispute whether Mass Bay breached that policy by underpaying Plaintiff's claim for property damage, and whether sustained damage as a result of that breach.

Because more than a scintilla of evidence shows that water damage – a covered peril – occurred on or about August 13, 2022, within the policy period, and caused damage to the Property greater than the sum of Mass Bay's prior payments, Mass Bay's motion for summary judgment should be denied.

#### i. Coverage for Tenant Improvements and Betterments

Mass Bay's argument regarding Tenant Improvements and Betterments is internally inconsistent. On the one hand, Mass Bay claims it has no responsibility for the cost of necessary

---

[14] *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997).
[15] *Bible Baptist Church v. Church Mut. Ins. Co.*, No. 2:21-CV-93-Z-BR, 2023 WL 1931912, at *9 (N.D. Tex. Jan. 18, 2023) (citing *Giles*, 950 S.W.2d at 56), *report & recommendation adopted by* 2023 WL 1931350 (Feb. 10, 2023).
[16] *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).
[17] *See* Ex. A to Dkt. 20, APPX 001-197 (Policy Contract between Mass Bay and Plaintiff).

repairs due to a lease provision allocating repair duties to the landlord. On the other hand, it seeks credit for paying $44,675.38 for interior repairs—an implicit recognition that coverage exists. This contradiction alone raises a genuine issue of material fact precluding summary judgment.

Specifically, Mass Bay proclaims that it paid for water mitigation and building repairs "to ensure Plaintiff could swiftly resume operations"[18] and cites to three documents in its appendix.[19] None of these documents actually reflect payment for interior repairs. Mass Bay only issued payment for half of the water mitigation estimate in October of 2022, hoping that Plaintiff's landlord would agree to pay the remainder.[20] It was not until February of 2023 that Mass Bay actually issued any payment for repairs to the Property[21]. In other words, Mass Bay estimated for the repairs in August of 2022, indicating awareness that it was liable under the Policy, but withheld the necessary funds, to Plaintiff's severe detriment, because it hoped that Plaintiff's landlord would agree to pay the bill. Plaintiff's inability to repair the property is a direct result of Mass Bay's contradictory coverage position. Whether those funds were timely and sufficient and whether Plaintiff breached any obligation under the policy are fact-intensive questions inappropriate for summary judgment.

ii. <u>Coverage for Business Personal Property (BPP)</u>

Mass Bay asserts that Plaintiff was fully compensated for Business Personal Property losses, relying heavily on its contractor RMC's scope of loss and mischaracterizing the testimony

---

[18] Dkt. 19, Def.'s Brief in Support of MSJ, at *6.
[19] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ. APPX 324-336 is an August 2022 estimate for water mitigation totaling $12,218.78; APPX 450-470 is an estimate for interior repair for $55,844.22, also from August of 2022; APPX78-383 is a January 2023 schedule of loss that calculates the Actual Cash Value of the August 2022 estimate for repairs.
[20] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit C, Claim Notes at APPX 223.
[21] *Id*.

of Plaintiff's representative. Mass Bay claims that Mr. Desai could not identify specific unpaid items. In truth, his testimony referred to a comprehensive equipment list provided by Patterson Dental—equipment Plaintiff submitted for coverage long before retaining counsel.[22]

Mass Bay was aware of this equipment list and denied coverage not because the items weren't claimed, but because Patterson had not physically inspected the water-damaged items.[23] That basis for denial is absent from the Policy and Texas law. The insurer imposed a post-hoc evidentiary condition—unsupported by any policy language—and now seeks to penalize the insured for failing to meet a non-existent burden.

Further, Desai's deposition must be read in context. His reference to the Patterson Dental proposal as a source of the claimed property establishes Mass Bay's notice of those losses. The record reflects that Mass Bay had all necessary information and instead chose to underpay, now attempting to shift the blame for its own denial onto the Plaintiff.[24] Plaintiff worked with Patterson Dental to estimate for the damaged BPP, totaling $409,438.55. Whether Mass Bay fully satisfied its contractual obligation as to BPP is a disputed issue of fact that must be decided by a jury.

**iii. Coverage for Business Interruption**

Mass Bay's Motion for Summary Judgment ignores the clear structure of the Business Income provision under its own Policy and relies instead on conclusory arguments and post hoc rationalizations to justify its underpayment. Section A. Coverage, 5.f.(1)(a) of the Policy—the Business Income insuring agreement—sets forth five required elements that must be met to trigger

---

[22] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit E, Deposition of Rinkesh Desai at APPX 281.
[23] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit C, Claim Notes at APPX 216.
[24] *Id*.

coverage for business income loss[25]: 1) An actual loss was sustained; 2) Due to the necessary suspension of operations; 3) The loss must occur during the period of restoration; and 4) That damage must be a direct physical loss caused by a covered cause of loss. While Mass Bay concedes elements one and four, it disputes elements two and three: whether the suspension of operations was "necessary" and whether the loss occurred within the "period of restoration."[26]

The suspensions of operations was necessary because the Property was undisputably untenable and the premises could not support continued operations. Mass Bay placed Plaintiff in the position of being unable to begin repairs, but knowing it would be punished if it did not start. This left Plaintiff with no control over the timeline or execution of restoration efforts. Under these circumstances, the suspension of operations was not only justified—it was necessary.

Mass Bay relies on the 60–90 day estimate of its retained building consultant to suggest the "period of restoration" ended in December 2022. But this theoretical window never materialized in practice. Mass Bay argues that its four-month Business Income (BI) payment exceeded its obligations under the policy, yet its own payment history tells a different story. Mass Bay adjusted through December 21, 2022, claiming that this date reflects the "period of restoration," but it then issued its first check for interior repairs on February 17, 2023—two months after its designated restoration period concluded. Moreover, Mass Bay failed to clearly designate its February 2023 payment as intended for Plaintiff to begin repairs, prompting confusion even

---

[25] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit A, The Policy at APPX 058 ("We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'. The 'suspension' must be caused by direct physical loss of or damage to a described premises shown in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damaged must be caused by or result from a Covered Cause of Loss.")

[26] Dkt. 19, Def.'s Brief in Support of MSJ, at *9.

after Plaintiff explicitly asked for clarification in March of 2023.[27] Mass Bay claims the "restoration period" should have lasted only 60–90 days, but the insurer's own conduct—waiting six months to issue the check and another two to define its purpose—belies this position.

As defined in the Policy, the "period of restoration" ends on the earliest of (a) the date when the property should be repaired with reasonable speed, (b) the date business resumes at a new permanent location, or (c) the policy's stated limit for indemnity months.[28] Here, business was never resumed at the original location. Nor did operations "relocate." The second location was not a substitute, but an expansion already in motion before the loss occurred. Moreover, Plaintiff never returned to the original space, which remains permanently closed. Mass Bay's failure to fund rent and repairs made restoration impossible, and the period of restoration therefore never concluded.

Even the most conservative calculation of Mass Bay's own Policy interpretation renders it liable for additional payments. Assuming, *arguendo*, that Plaintiff began restoration on the very same day Mass Bay's repair check was sent—not received; that Mass Bay clearly identified the check as authorization to begin repairs—though it did not; *and* that the restoration period lasted only 60 days—Mass Bay's most conservative estimate: Mass Bay still owes Plaintiff policy benefits of $70,207.51. Plaintiff's expert on business income calculated Plaintiff's monthly revenue to be $28,609.90. Plaintiff's first repair check is dated February 17, 2023. Adding 60 days sets a date of completion of April 18, 2023, or eight months and five days after the date of loss. This sets

[27] *See* Dkt. 20-1, Exhibit H at APPX 342-343 (Correspondence between Mass Bay and Plaintiff reflecting Plaintiff requested a "breakdown" of the February 17, 2022 check in March of 2023); Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit E, Deposition of Rinkesh Desai at APPX 281 ("I'm saying we're not sure what the payments are made for").
[28] *See* Dkt. 20-1, Exhibit A at APPX 058.

Plaintiff's policy benefits for business interruption at $233,647.51. Less Mass Bay's prior business interruption payments of $163,440, Mass Bay still owes Plaintiff $70,207.51 under the Policy using its own interpretation.

However, Defendant's claim that Plaintiff failed to resume operations "as quickly as possible" ignores the reality that the Property became untenable due to Mass Bay's own delay and contradictory coverage position. Mass Bay's failure to promptly and clearly fulfill its obligations directly caused the permanent closure of Plaintiff's primary office. At minimum, a factual dispute exists regarding the duration of the covered interruption and the sufficiency of Mass Bay's payments. Summary judgment must therefore be denied on this ground.

Defendant's disagreement with Plaintiff's expert and witnesses on the amount of policy benefits defeats summary judgment on its face. Weighing the value of Plaintiff's expert's opinions and lay testimony against Mass Bay's evidence "tend to go to the sufficiency and weight of the evidence, rather than the summary judgment issue of whether there is any evidence raising a disputed issue of fact."[29]

Plaintiff put forth evidence based on dental equipment proposals, personal observations, and expert opinions that the Property sustained damage in excess of Mass Bay's prior payments. Weighing this evidence is a question of fact rightly reserved for the fact finder. Construing all facts and reasonable inferences in favor of Plaintiff, more than a genuine issue of material fact exists to

---

[29] *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 218 (Tex. App.—San Antonio 2012, pets. denied). *See also Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 508 (Tex. App.—Tyler 2008, pet. denied) (stating courts are "not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits and other summary judgment proof" in deciding a motion for summary judgment). *See also Southland Lloyds Ins. Co. v. Cantu*, 399 S.W.3d 558, 575-76 (Tex. App.—San Antonio 2011, pet. denied) (holding that the jury rightly faced a credibility question between the insured's evidence that the sole cause of damage was a hailstorm and the insurer's evidence that some of the damage was caused by wear and tear).

show that Mass Bay breached the policy contract when it denied timely and full coverage under the policy, which caused Plaintiff to sustain damages. As such, Mass Bay's motion for summary judgment should be denied.

## B. Plaintiff's Evidence Raises a Fact Issue on Mass Bay's Violations of Chapter 541 of the Texas Insurance Code.

There is also more than a genuine issue of material fact that Mass Bay engaged in an act or practice that constitutes a violation of Chapter 541. "[T]he elements of a cause of action for a Chapter 541 unfair or deceptive insurance practice are: (1) the plaintiff and the defendant qualify as a 'person' as defined by § 541.002(2) of the Insurance Code, (2) the defendant engaged in an act or practice defined as an 'unfair method of competition' or 'unfair or deceptive act or practice' by Subchapter B of Chapter 541, and (3) the act or practice was a producing cause of actual damages."[30] Plaintiff raises more than a scintilla of evidence on each element of its Chapter 541 claim, as set forth below.

Under Texas law, "an insurer breaches its duty of good faith and fair dealing by denying a claim when the insurer's liability has become reasonably clear."[31] The focus turns to the "reasonableness of the insurer's conduct in rejecting the claim."[32] The evidence must "permit the logical inference that the insurer had no reasonable basis to delay or deny payment of the claim, and that it knew or should have known it had no reasonable basis for its actions."[33]

---

[30] *Gomez v. Travelers Lloyds of Tex. Ins. Co.*, No. DR-15-CV-007-AM-VRG, 2015 WL 13047865, at *5 (W.D. Tex. May 29, 2015) (citing TEX. INS. CODE § 541.151(1)).
[31] *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998) (citing *Universe Life Insurance Company v. Giles*, 950 S.W.2d 48, 56 (Tex.1997)).
[32] *Lyons v. Millers Cas. Ins. Co. of Texas*, 866 S.W.2d 597, 601 (Tex. 1993).
[33] *Id.* at 600.

"An insurer will not escape liability merely by failing to investigate a claim so that it can contend that liability was never reasonably clear."[34] So, the Texas Supreme Court has held that "an insurance company may also breach its duty of good faith and fair dealing by failing to reasonably investigate a claim." *Id.* "An insurer fails to reasonably investigate a claim if the investigation is conducted as a pretext for denying the claim, was conducted with an 'outcome oriented' approach, or an expert's report was not objectively prepared."[35]

Whether Mass Bay acted reasonably in handling Plaintiff's Chapter 541 claim is a fact-specific inquiry that is "judged by the facts before the insurer at the time the claim was denied."[36] The facts that are in evidence show that Mass Bay failed to reasonably investigate and adjust Plaintiff's claim at the time it denied the claim. Mass Bay's adjuster, Steve Shands, partially denied Plaintiff's claims for BPP because Plaintiff did not provide sufficient evidence. Mass Bay's claim file shows that Mr. Shands had estimated for TIB policy benefits for six months before he issued payment. Mr. Desai testified that Mr. Shands told him not to pay rent until Plaintiff's landlord repaired the space on his own dime. The clear language of the Policy, the incontrovertible evidence of the severe covered damage, and Mass Bay's claim file demonstrating unfair practices resulting in untimely and incomplete payments directly contradicts Mass Bay's adjuster's assessment that Plaintiff should have resolved operations in four months. This creates a legitimate factual dispute about the reasonableness of Mass Bay's investigation.[37]

---

[34] *Giles*, 950 S.W.2d at 56 n.5.

[35] *Switzer v. State Farm Lloyds*, 642 F. Supp. 3d 568, 572 (W.D. Tex. 2022) (citing *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 458 (Tex. 1997), *Simmons*, 963 S.W.2d at 44-45).

[36] *Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990); *see also A&E Austin 1, Ltd. v. Nationwide Gen. Ins. Co.*, No. SA-21-CV-01031, 2023 WL 4921531, at *6 (W.D. Tex. Aug. 1, 2023) ("In Texas, whether an insurer's liability is reasonably clear is not a question of law."); *Kahlig Auto Group v. Affiliated FM Ins. Co.*, No. 5:19-CV-1315-DAE, 2021 WL 5227093, *13 (W.D. Tex. May 20, 2021) (holding insurer "is not entitled to summary judgment on the Section 541 Claim" where there were credibility determinations to be made regarding notes in the claim file, which "is a fact issue not suitable for resolution on summary judgment").

[37] *See Sustainable Modular Mgmt., Inc. v. Travelers Lloyds Ins. Co.*, No. 3:20-CV-1883-D, 2022 WL 2134022, at *17 (N.D. Tex. June 14, 2022) (concluding that a reasonable jury could find that it was unreasonable for insurer to rely

As set forth above, there is more than a scintilla of evidence that Mass Bay ignored evidence of coverage when it conducted its unreasonable investigation of Plaintiff's claim. This is evidence of bad faith, and Mass Bay's motion for summary judgment should be denied.

### C. **Evidence of a bona find coverage dispute does not shield Mass Bay from liability under the Texas Insurance Code.**

Mass Bay cannot avoid liability under Chapter 541 by simply declaring that this case is a "bona fide coverage dispute."[38] Although Mass Bay applies this argument universally to all of the acts alleged by Plaintiff, it is only helpful to Mass Bay if there is no genuine issue of material fact that it conducted a reasonable investigation ***and*** in the very limited context of Plaintiff's claim that Mass Bay failed in good faith to effectuate a settlement once liability was reasonably clear. And, even in this context, a genuine issue of material fact exists regarding whether there was a bona fide coverage dispute.

In 1994, the Texas Supreme Court first formally acknowledged the bona fide dispute rule in *Transportation Ins. Co. v. Moriel*, establishing that a genuine dispute over an insurer's liability does not automatically constitute bad faith.[39] The Court also clarified that mere disagreements among experts regarding coverage do not equate to bad faith.[40] Subsequently, in *State Farm Lloyds v. Nicolau*, the Court emphasized that it "ha[s] never held that the mere fact that an insurer relies on an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law."[41] To the contrary, the Court has "repeatedly acknowledged that an insurer's reliance upon an

---

on report to "initially deny" insured's claim, given conflicting evidence regarding cause of damage and photographic evidence of damage).

[38] Dkt. 19 at *13.

[39] *See* 879 S.W.2d 10, 17 (Tex. 1994).

[40] *See id.* at 18.

[41] 951 S.W.2d 444, 448 (Tex. 1997).

expert's report, standing alone, will not necessarily shield the carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable."[42]

Further refining the doctrine, the Texas Supreme Court articulated a more precise standard for bad faith in *Universe Life Ins. Co. v. Giles.*[43] There, in clarifying the standard for recovery in common law bad faith cases, it pronounced that an insurer breaches the common law duty of good faith and fair dealing when it denies a claim even though it "knew or should have known that it was reasonably clear that the claim was covered."[44] This shift towards a "reasonably clear" standard aimed to harmonize the common law with statutory mandates against unfair settlement practices, emphasizing the insurer's duty to seek a fair, prompt, and equitable settlement once liability becomes reasonably clear.[45]

Here, the evidence shows that Mass Bay opened coverage for Plaintiff's loss, but did not fully or promptly pay for the loss based on conditions that were not contemplated in the Policy, such as the landlord's refusal to pay Mass Bay's obligations, or Plaintiff's "responsibility" to provide pre-suit inspection reports of its dental equipment.[46] The testimony of Mr. Desai that Mr. Shands suggested that Plaintiff refuse to pay rent until Plaintiff's landlord repaired the covered property himself[47] should be heard by a jury weighed for credibility.

---

[42] *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Dominguez*, 873 F.2d 373, 377 (Tex. 1994).
[43] 950 S.W.2d at 56.
[44] *Id.*; *see also Nicolau*, 951 S.W.2d at 448 (recognizing that the prior standard imposed common law bad faith when an insurer denied a claim "with no reasonable basis").
[45] *See Giles.* 950 S.W.2d at 55; *see also State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998) ("an insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denial").
[46] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit C, Claim Notes at APPX 216.
[47] Dkt. 20-1, Def.'s Exhibits in Support of its MSJ, Exhibit E, Deposition of Rinkesh Desai at APPX 278 ("Steven Shands is the insurance adjustor that we worked with and he told us that, Hey, this is, you know, the landlord's responsibility, you shouldn't have to pay rent.")

None of these violations can be avoided under the bona fide coverage dispute shield. Construing all facts and reasonable inferences in favor of Plaintiff, more than a genuine issue of material fact exists to support each of Plaintiff's Chapter 541 claims. Thus, the Court should deny summary judgment, leaving it to the jury to determine whether Mass Bay reasonably handled Plaintiff's claim.

**D. There is Evidence that Mass Bay Violated Chapter 542 By Delaying and Denying Policy Benefits on Plaintiff's Claim.**

There is a genuine issue of material fact that Mass Bay is liable for additional policy benefits on Plaintiff's claim and failed to comply with any requirements of the Texas Prompt Payment of Claims Act by making late payments under the Policy.

Under Chapter 542, Plaintiff can recover a statutory penalty under the Texas Prompt Payment of Claims Act if it establishes: "(1) a claim under an insurance policy; (2) that the insurer is liable for the claim; and (3) that the insurer has failed to comply with one of the requirements of the statute with respect to the claim."[48] "If an insurer is found liable for a claim under an insurance policy and does not promptly respond to or pay the claim as the statute requires, the insurer is liable to the policy holder or beneficiary for (1) the amount of the claim, (2) 18% interest per year on the amount of the claim as damages, and (3) attorney's fees."[49]

Accordingly, Chapter 542's statutory damages are also contingent on finding the insurer liable for denying or underpaying an insured's claim.[50] As set forth above, there is a genuine issue

[48] *Barron v. Century Sur. Co.,* No. 1:22-CV-00144-MAC-ZJH, 2024 WL 2807224, at *7 (E.D. Tex. May 9, 2024), *report and recommendation adopted*, No. 1:22-CV-00144-MAC-ZJH, 2024 WL 3861357 (E.D. Tex. Aug. 16, 2024) (citing *Patton v. Meridian Sec. Ins. Co.*, 617 F. Supp. 3d 516, 540 (N.D. Tex. 2022).
[49] *Barron*, 2024 WL 2807224, at *7 (quoting *Patton*, 617 F. Supp. 3d at 539 (citing TEX. INS. CODE § 542.060(a)).
[50] *See Hinson v. State Farm Lloyds*, No. 420CV00093SDJCAN, 2021 WL 1131231, at *11 (E.D. Tex. Mar. 10, 2021), *report and recommendation adopted*, No. 4:20-CV-093-SDJ, 2021 WL 1608495 (E.D. Tex. Apr. 26, 2021) (denying summary judgment on insured's Chapter 542 claims as premature when liability is still in question because "[t]he Fifth Circuit has held that "[a] wrongful rejection of a claim may be considered a delay in payment for purposes of the 60-day rule and statutory damages" under Chapter 542); *Agredano v. State Farm Lloyds*, 975 F.3d 504, 507 (5th

of material fact that Mass Bay is liable under the Policy for Plaintiff's claim. There is also evidence that it knowingly violated the Texas Insurance Code during its unreasonable investigation and bad faith in handling of the same.

Plaintiff has raised a genuine issue of material fact to support an award for actual damages as a result of Mass Bay's statute violation. This award supports statutory damages under Chapters 541 and 542 of the Texas Insurance Code. Therefore, Mass Bay's motion for summary judgment should be denied in its entirety.

## SUMMARY JUDGMENT EVIDENCE

In addition to relying on the summary judgment evidence offered by Mass Bay, Plaintiff offers the following summary judgment evidence:

Exhibit 1 Declaration of Jessica Dent

Exhibit 1-A: Defendant's Expert Report of Louis G. Fey, Jr.

## CONCLUSION AND PRAYER

For the foregoing reasons, Mahant Dental respectfully asks the Court to deny Mass Bay's motion for summary judgment in its entirety. Plaintiff further requests all other relief to which it may show itself entitled.

Respectfully submitted,

**DALY & BLACK, P.C.**

By: */s/ Jessica Dent*
Jessica Dent
State Bar No. 24121561
Richard D. Daly

.

Cir. 2020) (holding that "it is not necessary for a plaintiff to prove that the insurer acted wrongfully or in bad faith'—-'[t]he statute requires only liability under the policy and a failure to comply with the timing requirements of the TPPCA'").

State Bar No. 00796429
rdaly@dalyblack.com
Maria R. Gerguis
State Bar No. 24090355
mgerguis@dalyblack.com
2211 Norfolk St., Suite 800
Houston, Texas 77098
713.655.1405—Telephone
713.655.1587—Fax
ecfs@dalyblack.com (service)
and
Michael Holmes
State Bar No. 24083191
Holmes Law Group, PLLC
10233 E. Northwest Hwy, Ste. 333
Dallas, Texas 75238
Tel: 214-444-9533

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, a true and correct copy of the forgoing was served on all counsel of record by the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure.

Peri H. Alkas
Mark C. Dodart
Nicole M. Hilburn
PHELPS DUNBAR, LLP,
910 Louisiana, Ste 4300,
Houston, TX 77002
peri.alkas@phelps.com
nicole.hilburn@phelps.com
**ATTORNEYS FOR DEFENDANT**

By: *__/s/ Jessica C. Dent____*
Jessica C. Dent

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MAHANT DENTAL PLLC D/B/A COTTON WOOD DENTAL,** | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No. 3:24-cv-01791-G** |
| **vs.** | § | |
| **MASSACHUSETTS BAY INSURANCE COMPANY,** | § | |
| **Defendant.** | | |

**DECLARATION OF JESSICA C. DENT (IN LIEU OF AFFIDAVIT)**

I, Jessica C. Dent, declare and state as follows, in accordance with section 132.001(a) of the Texas Civil Practice and Remedies Code:

1. My name is Jessica C. Dent. I am over the age of 18 years, of sound mind, and capable of making the declaration. I make this declaration on my own information, knowledge, and belief. The matters stated herein are true and correct and the facts stated below are within my personal knowledge. I could testify competently to these matters and facts if asked. I declare under penalty of perjury the following is true and correct.

2. I am the counsel of record in the above captioned matter and am responsible for the day-to-day management of the litigation on behalf of Plaintiff during the course of this litigation. Mahant Dental offers the following exhibits in support of their motion:

Exhibit 1-A: Defendant's Expert Report of Louis G. Fey, Jr.

3. Exhibit 1-A attached to Plaintiff's Response to Massachusetts Bay Insurance Company's Motion for Summary Judgment are true and correct copies of the foregoing.

Executed in Harris County, Texas on June 24, 2025.

/s/ *Jessica C. Dent*
Jessica C. Dent

# EXHIBIT 1-A

# EXPERT REPORT OF
# LOUIS G. FEY JR, CPCU, CIC, CRM, AIC
# FEY CONSULTING LLC

June 4, 2025

**MAHANT DENTAL, PLLC D/B/A COTTON WOOD DENTAL**

**PLAINTIFF**

**VERSUS**

**MASSACHUSETTS BAY INSURANCE COMPANY,**

**DEFENDANT.**

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

**CIVIL ACTION NO: 3:24-cv-01791-G**

EXHIBIT
C

I will act as an expert witness regarding the insurance industry standards and practices applicable to property insurance underwriting and claim handling. Specifically, Massachusetts Bay Insurance Company ("MBIC") has retained me to evaluate its handling of Mahant Dental, PLLC D/B/A Cotton Wood Dental's ("Mahant") property insurance claim ("the claim"). In doing so, I will compare MBIC's handling of the claim to the universally accepted insurance industry standards that apply to the handling of property insurance claims.

Based on my review and with the benefit of my qualifications and expertise, I have been asked to express certain opinions, as will be more fully set forth below. Where such an opinion is stated, it is provided based upon information provided to me that I consider reliable and of the type of information reasonably relied upon by one in my profession. My opinions are given with a reasonable degree of professional certainty, based upon the use of a reliable methodology, which includes my review of the documents listed below, applying my forty-four (44) years of experience and training in the handling of property insurance claims and the underwriting property insurance, and by then comparing my findings to the applicable industry standards that apply to the insurance industry. As reflected in Exhibit A, I have been previously found qualified to testify on such matters by numerous federal and state courts.

**MY QUALIFICATIONS IN THE FIELD OF INSURANCE:**

Attached as "Exhibit A" to this opinion is my curriculum vitae, which contains my work history, positions held on various state boards, accomplishments in the field of insurance and continuing education, as well as a partial list of courts by which I have been deemed qualified to testify on insurance matters, a partial list of seminars I have given, and a complete list of my past testimony over the past four years.

I have over forty-four (44) years of practical experience handling complex property casualty claims and related litigation, directing and overseeing insurance company defense counsel, and managing and directing claims, underwriting, and agency operations.

As Vice President of Risk Management for a top 30 insurance broker, I assisted insurance carriers and insured entities by intervening and/or advising on complex or problematic claims. I assisted insurance producers with insurance coverage analysis, program analysis, and risk management for both corporate and personal clients.

I have also spent many years instructing and training personnel from insurance companies and insurance agencies, as well as reviewing, auditing, conducting, and supervising multi-line claim investigations. I have personally handled and supervised thousands of property insurance claims (large and small) and was previously in charge of underwriting for the Southeast United States for a large Property and Casualty Insurance Company.

In my role at Fey Consulting LLC, I provide expert witness services for attorneys representing insureds, insurance agents, and insurance companies. I assist with insurance claims, coverage issues or disputes, and improper denials. I evaluate and provide litigation support and/or expert testimony addressing claim handling, allegations of agency errors and omissions, underwriting disputes, and a variety of other insurance-related issues.

I also regularly advise industry representatives and legislative authorities regarding insurance matters, and I am deeply involved in legislative initiatives related to the Property Casualty Insurance industry. I regularly conduct seminars for the insurance industry, which are recognized for continuing education credits.

The summer 2009 edition of the ABA Tort Trial Insurance Practice Insurance Coverage Litigation Committee Newsletter contained an article entitled “The Use of Experts in Insurance Bad Faith Litigation.” The article concludes that the most effective experts are those who are qualified by experience in the insurance industry and who support their position with case facts. As you can see from my qualifications, I have extensive industry experience, and I base my opinions on the documented facts of the case, combined with my expertise.

## BASIS OF MY OPINIONS

I have considered the following documents in preparing my opinion(s):

- The Deposition Testimony of Rinkesh Desai with Exhibits
- The Deposition Testimony of Dr. Patel
- Mass Bay 000001 to Mass Bay 002166
- The Petition
- The report of Randall Taylor

In addition, my opinions are supported by a broad spectrum of education, training, research, and over four decades of experience. I also have access to various industry resources, including Sage, Silver Plume, FC&S, and IRMI. I research industry writings and the above textbooks daily. I apply and draw from my experience in multi-line claim handling, underwriting, agency, and management to arrive at my conclusions. My opinions are also supported by information contained in industry textbooks that I have studied, used to teach other adjusters, and to which I often refer.

## INDUSTRY STANDARDS

Insurance industry standards for handling claims have been developed over many years and are applicable in all jurisdictions. These standards are universally accepted industry principles that all adjusters, agents, and insurers are expected to follow, understand, teach, and apply to their everyday professional practice. While state statutes may occasionally impact these standards, insurance companies must always comply with the law. However, these well-founded standards are invariably more stringent than state law, which the insurance industry typically recognizes as the minimum standards.

Some standards were developed through years of industry study, discussion, and practice as reasonable methods for addressing insurance matters, while others evolved due to court decisions or other industry developments that impacted common practice. All state unfair claim practice standards align with these industry standards. For example, insurers must have a justifiable reason to deny a claim and must treat an insured’s interests with at least the

same regard as their own. An insurer must handle claims in accordance with these standards. See Exhibit B for a general discussion of some (but not all) of the more common standards applicable to insurance claim handling that I address regularly in claim handling litigation, such as the underlying matter. Where these standards are specifically relevant to the underlying case, I attempt to reference the specific page of Exhibit B through footnotes.

These industry standards are reflected in various documents and books. Well-run insurance claim operations have internal Best Practices that are intended to guide their adjusters' claim handling, which they protect from general circulation and which are sometimes only produced after court order, subject to confidentiality agreements. However, some of these standards can be found posted on the Internet, such as "State Farm's Claim Handling Standards", and they can also be found in industry textbooks and related study guides created to teach these standards to adjusters. The National Association of Insurance Commissioners (NAIC) has also created a formal list of minimum fair claim practice standards, which was developed based on common practices and these oft-cited industry standards. NAIC Unfair Claims Practices and other NAIC models, based upon these well-defined insurance industry standards, have been adopted and codified in many jurisdictions.

Over the years, I have helped formalize these standards for various insurance companies by creating Claim Handling Guidelines and Best Practices. As an expert witness, I have reviewed the claim guidelines, underwriting standards, and best practices of numerous insurance companies. Although confidentiality agreements protect the exact details of these Claim Guidelines, these standards are essentially the same.

Insurance companies must be honest and forthright when handling claims and treat an insured's interests with at least the same regard as their own. Just as one would need to understand the training and expectations of other professionals (for example, doctors, lawyers, and accountants) to be able to evaluate the actions of insurance professionals, one must understand the expectations and training received by agents, underwriters, and adjusters, to be able to assess how they should act, as compared to how they have responded or failed to respond to particular situations, issues, or claims. These are insurance industry standards and practices that are not commonly known

or fully understood by those outside the insurance profession.

These industry standards establish the framework for how insurers handle claims and underwrite insurance policies. Any material deviation from these standards is either a failure by the insurer to properly train and supervise its employees or the result of a corporate culture that deviates from industry expectations. These standards can also be found in industry textbooks, such as The Claims Environment (first and second editions), by James J. Markham et al. (1999), and Doris Hoopes, Insurance Institute of America, 4th edition, which has been used in the Associate in Claims curriculum. Insurance Companies are expected to comply with these universal industry standards, as well as any applicable state law requirements. I am using these universal standards to evaluate MBIC's claim handling.

To clarify, when I comment on coverage or the obligations of the various parties in this report, I do so solely to discuss industry standards, customs, and practices. Likewise, where I discuss certain policy provisions or the intent behind coverage forms or exclusions, **I do so from an insurance industry perspective** to evaluate the issues or **to illustrate the application of industry standards to an adjuster's evaluation of coverage**, which must be examined to be able to determine if the claim was handled appropriately from an insurance industry perspective, **not a legal perspective**. To the extent that there are any coverage disputes in this matter, **my opinion should not be viewed as an attempt to declare or disclaim coverage for the underlying claim. Likewise, I do not opine on the application of state or common law.** My opinions solely discuss insurance industry standards and practices, as well as how the claim was handled from an insurance perspective.

My intent is to assist by explaining certain claim handling activities, highlighting policy provisions impacting the underlying claim, or highlighting certain claim activities, and by then discussing whether the insurer's coverage position, actions or inaction, deviated from or conformed to the insurance industry standards, claim handling best practices, insurance ethics, and procedures.

I may also discuss the industry intent behind certain policy provisions, the standards that apply to an adjuster's evaluation and investigation of a claim, and sound claim management oversight of an adjuster's claim handling.

These are all important considerations when evaluating an insurance company's actions. A close reading of my opinion will reveal that **I do not mention any applicable law; instead,** I discuss claim handling, common practices, standards, and industry expectations. These are processes and procedures that are not easily recognized or understood by those outside the insurance profession.

This opinion sometimes uses quotes from the documents I have reviewed. When something is quoted, it is set in italics. Quotes are typically in pertinent parts, with emphasis added. I also sometimes correct minor spelling errors or punctuation in quoted language.

## STANDARDS APPLICABLE TO FIRST-PARTY CLAIMS

- Insurance companies are required to seek to find coverage, not coverage controversy;[1]
- Insurance companies must never place their own interests ahead of the policyholder;[2]
- Once coverage has been triggered, insurance companies have the burden to prove the applicability of a policy exclusion or limitation;[3]
- Insurance companies must conduct a fair, objective, thorough, and timely investigation;[4]
- Insurance companies must evaluate claims fairly, objectively, thoroughly, and timely;[5]

[1] James J. Markham, The Claims Environment, used in the Associate in Claims curriculum, page 13. See Exhibit B, page 2.
[2] Exhibit B page 1, 2, 3, 4, 12, 17.
[3] See Exhibit B page 7 -9.
[4] Exhibit B page 2.
[5] Exhibit B page 2.

- Insurance companies must continuously re-evaluate claims as new or additional information becomes available and, in a first-party setting, issue supplemental loss payments timely as the undisputed loss increases during the life of the claim;[6]

- Insurance companies must affirm or deny coverage promptly;[7]

- It is a standard practice for insurance companies to pay all undisputed sums promptly and in accordance with the policy loss payment provision;[8]

- Insurance companies must timely advise policyholders of all policy defenses identified during a claim investigation while reserving the right to assert those defenses in writing;[9]

- Once a coverage defense is identified, insurance companies must stop all investigation until the policyholder is fairly informed of the issue and allowed to protect their interests;[10]

- Insurance company's coverage positions must be in writing, clearly explained, and fairly inform policyholders of all bases for an insurer's refusal to pay a claim (either a full or partial denial);[11]

- Insurance company's coverage positions must be in writing, clearly explaining and fairly informing policyholders precisely how policy defenses identified or asserted apply to the claim;[12]

- The insurance company's evaluation of the claim must be placed in writing, clearly explaining and fairly informing policyholders of the insurer's position on the claim;

---

[6] Exhibit B, page 15.
[7] Exhibit B, page 5.
[8] Exhibit B page 7 & 17.
[9] Exhibit B page 13.
[10] Exhibit B page 6, 7, 11, 13, 14.
[11] Exhibit B page 6, 7, 11, 13, 14.
[12] Exhibit B page 6, 7, 11, 13, 14.

- A reservation of rights is not forever. Insurance companies must take a concrete coverage position and place that position in writing once a fair, prompt, and thorough investigation is complete;[13]

- Insurance companies must oversee litigation to ensure that company defense counsel acts in accordance with insurance industry standards and must never cede claim-handling responsibilities to counsel;[14]

- Insurance companies are responsible for the acts of their defense counsel;

- Since a claim should never be denied unless or until a fair, objective, thorough, and timely investigation has been conducted, insurance companies cannot use the litigation process to pad their bases for denial;

- Since a denial means the insurance company determined that the insurance policy does not apply to the claim, once a claim is denied, the policyholder becomes a "free-agent" and, therefore, cannot be held accountable for a failure to comply with a condition of coverage after denial;"

- An insurance company must never misrepresent facts or policy provisions or assert coverage positions that are without merit;[15] and

- Insurance companies must continue to investigate claims and reevaluate coverage and damages during the litigation process;[16]

Similarly, policyholders also have various obligations, not the least of which is to be honest and forthright when presenting a claim. Concealment, misrepresentation, inflating a claim, or outright Fraud can void the entire insurance contract. Policyholders are also required to comply with specific "Duties After Loss" that include such requirements as:

- Notify the police if a law may have been broken.

---

[13] Exhibit B page 7, 10 - 14.
[14] Exhibit B page 1, 4, 7, 14, 15.
[15] Exhibit B page 5.
[16] Exhibit B page 14.

- Give the Company prompt notice of the loss or damage, including a description of the property involved;

- As soon as possible, give the Company a description of how, when and where the loss or damage occurred;

- Take all reasonable steps to protect the Property Insured from further damage. If feasible, set the damaged property aside and in the best possible order for examination. Also, keep a record of expenses for emergency and temporary repairs for consideration in the settlement of the claim;

- At the Company's request, provide a complete inventory and documentation of damaged and undamaged property, including quantities, costs, values, and the amount of loss claimed;

- As often as reasonably required, permit the Company to inspect the property, books, and records evidencing the loss or damage, including taking some or all of the damaged and undamaged property for inspection, testing, and analysis, and permit the Company to make copies of the Insured's books and records;

- Permit the Company to question the Insured, the Insured's employees, and agents under oath while not in the presence of any other Insured;

- Give the Company proof of loss containing the information necessary to investigate and evaluate the claim; and

- Cooperate with the Company in the investigation or settlement of the claim.

**<u>OPINIONS</u>**

1. MBIC complied with or exceeded the following NCIC claim handling standards:

- MBIC clearly explained coverage and relevant facts or policy provisions relating to Mahant's coverage for the claim;

- MBIC promptly acknowledged and responded to all communications with respect to Mahant's claim;

- MBIC's claim handling reflects reasonable standards for the prompt investigation and settlement of Mahant's claim;

- While Mahant disagreed with MBIC's evaluation of its claim, MBIC attempted in good faith to effectuate a prompt, fair, and equitable settlement throughout the claim process, paying all undisputed amounts promptly;

- While Mahant filed suit alleging bad faith, MBIC's claim handling was more than reasonable, and, in my view, MBIC overpaid the underlying claim;

- MBIC conducted not only a reasonable investigation, but a thorough one;

- MBIC affirmed coverage immediately. This dispute is a disagreement over the amount of damage and Mahant's business income loss;

- MBIC attempted to appease Mahant by offering far more than is supported by Mahant's documentation and MBIC's investigation, giving Mahant the benefit of all doubt.

- If it is determined that Mahant intentionally exaggerated and inflated its claim or intentionally misrepresented facts, the application of the policy's misrepresentation provision should be evaluated;

- While Mahant asserts that MBIC did not explain its claims payments, MBIC provided Mahant with an itemized spreadsheet clearly outlining what was being paid, what items

were found to be damaged, replacement cost, depreciation, and actual cash value;

- MBIC promptly paid all undisputed sums;

- MBIC never disputed coverage;

- MBIC explained Mahant's obligation to restore its operations as quickly as possible on multiple occasions. Mahant failed to do so, choosing instead to open another dental practice at another location;

- MBIC explained the replacement cost process to Mahant on multiple occasions, yet Mahant refused to acknowledge the process or submit the required documentation before demanding payment;

2. MBIC's expert reported that Rinkesh Desai told him that the water level from the leak was only one inch, and if true, it is unlikely that most dental equipment could have been damaged;[17]

3. MBIC's experts and field adjusters documented that much of Mahant's dental equipment was undamaged;

4. MBIC paid Mahant for dental equipment that Mahant claimed was damaged, even though MBIC's expert concluded there was no damage;[18]

5. While Mahant did not attempt to restore operations, MBIC felt that its operations could have been restored within *"a couple of months,"* and according to the Expert report of Randall Taylor, the period of restoration would have been no longer than 60 to 90 days;

[17] J. S. Held report Mass Bay 000787.
[18] Particularly the ProMax model S3-2D panoramic dental imaging unit. J. S. Held report Mass Bay 00078.

6. Since MBIC paid Mahant for 4.5 months of business interruption, it appears that it more than fairly compensated Mahant for that element of damage;

7. MBIC's projection that the period of restoration was *"a couple of months*" appears very reasonable given the amount of damage and the fact that the unit was dry and ready for repairs within days of the loss;

8. The claim was complicated by Mahant's shuttering its operations;

9. The period of restoration ended either *"a couple of months*" after the loss or when Dr. Patel resumed operations at her new permanent location, whichever came first;

10. Dr. Patel purchased another dentistry practice under another corporate name, a pertinent fact not fully disclosed to MBIC, concealing an essential factor in determining the period of restoration;

11. Dr. Patel's purchase of another dentistry practice under another corporate name, and her transfer of equipment from Mahant's operation, complicated MBIC's investigation and evaluation of the loss;

12. MBIC's payment of $163,400 towards Mahant's lost income was reasonable if not generous;

13. Mahant failed to restore operations as quickly as possible, and in fact discontinued them;

14. Business Personal property relocated from Mahant to Dr. Patel's new practice was a red flag;[19]

15. Mahant's claim of damage to items above the water line was a red flag;

---

[19] Red flags are fraud indicators. While one or two red flags are not necessarily a reason for alarm, if there are more than three red flags, the claim should undergo a Special Investigation by the insurer's SUI department.

16. Mahant's claim of damage to electronic circuitry far above the water line was a red flag;

17. Mahant's lease agreement called for Mahant to contribute to the premium of the owner's property insurance policy, which likely provided coverage for the damage to the structure;

18. While MBIC did not have coverage for Mahant's structure, it paid the cost to repair the damage;

19. MBIC overpaid Mahant's Business Personal Property claim;

20. MBIC has a reasonable basis to dispute Mahant's claim that it is owed additional sums for damage and lost income;

21. The policy is only intended to cover the property of Mahant, not the property or business income loss of another PLLC;

22. While MBIC paid Mahant the cost to repair the structure to assist with its resumption of operations, Mahant failed to make the necessary repairs. As such, MBIC should be entitled to an offset of $44,675.38;

23. Mahant's lease complicated the claim. The building owner refused to repair the unit, taking the position that there was no guarantee that Mahant would continue operations at that location;

24. Since Mahant discontinued operations, MBIC was not obligated to continue paying business income;

25. I spotted at least 14 red flags;

26. MBIC did an exceptional job handling Mahant's claim;

27. MBIC handled this claim in accordance with all insurance industry standards and gave Mahant the benefit of every doubt. Any criticism of MBIC's claim handling is severely misplaced.

## BACKGROUND

On August 13, 2022, a valve failed, resulting in a water leak that damaged the insured's location. J.S. Held reported that Rinkesh Desai informed them during their inspection that the water only reached a depth of one inch. Regardless, Mahant sustained damage to some business personal property ("BPP") and incurred a loss of business income.

After repeated inspection by experts, MBIC paid Mahant $378,339.10, an amount comprised of $163,440 for Mahant's business income loss and $214,899.21 for damage to its dental equipment and other business personal property (BPP).

Unsatisfied, Mahant filed suit against MBIC, claiming additional unpaid damages and alleging that MBIC handled its claim in bad faith.

## THE POLICY

MBIA issued property insurance policy No. ODD-D878896-03 to Mahant Dental, PLLC DBA Cotton Wood Dental, located at 2230 W. Walnut Hill Lane, Irving, TX 75038. The policy is subject to a $463,050 limit for BPP with no coverage for the structure. Losses under the policy are valued at Replacement Cost ("RCV") and subject to a $1,000 deductible.

The policy provides coverage for loss of Business Income ("BI") caused by a covered cause of loss, on an actual loss sustained basis, for a maximum of 12 months, or the period of restoration as defined, whichever comes first. BI coverage is subject to a 24-hour "waiting period" (time element deductible).

Several policy provisions will need to be evaluated by the court. I will list them (in pertinent part emphasis added) and provide comments from an insurance industry perspective. To clarify, I am not opining on coverage. This is merely a discussion of pertinent policy provisions that influence coverage for the underlying claim.

*SECTION I - PROPERTY*

*A. Coverage*

*We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.*

This is the policy's insuring agreement. Suffice it to say that water damage from a failed valve that damaged Mahant's BPP (covered property) during the policy term was a covered cause of loss.

Form 391-1003 08 16 Page 10 – 12 of 81 (Pages 58 – 60 of 197 of the PDF)

*(c) Business Income means the: (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred…*

*(ii)* ***Continuing*** *normal operating expenses incurred, including "payroll expenses"…*

***(iii) We will reduce the amount of your:***

***Business Income loss****, other than Extra Expense,* ***to the extent you can resume your "operations", in whole or in part,*** *by using damaged or undamaged property (including merchandise or "stock")* ***at the described premises or elsewhere.***

***(iv) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.***

**In short, the insured is required to make repairs and resume operations as quickly as possible.** The Period of Restoration is further defined as follows:

Form 391-1003 08 16 Page 57 of 81 (Page 105 of 197 of the PDF)

*41. "Period of Restoration"*

*a. Means the period of time that:*

*(1) Begins:*

*(a) After the number of hours shown as the Business Income Waiting Period in the Declarations after the time of direct physical loss or damage for Business Income Coverage; or*

*(b) Immediately after the time of direct physical loss or damage for Extra Expense Coverage; caused by or resulting from any Covered Cause of Loss at the described premises; and*

***(2) Ends on the earlier of:***

*(a)* ***The date when the property at the described premises should be repaired, rebuilt or replaced*** *(to a condition permitting occupancy)* ***with reasonable speed*** *and similar quality; or*

***(b) The date when business is resumed at a new permanent location****;*
...
Policyholders also have obligations when pursuing claims. Those obligations include cooperating with the insurance company, mitigating damage, protecting covered property from further damage, and making repairs as quickly as possible to restore operations.

A reasonable dispute over the amount paid on the claim is not an excuse for an insured's failure to repair damaged property and to restore operation as soon as possible. A policyholder must mitigate the loss. While MBIC paid Mahant for the cost of repairs even though the policy did not cover the structure, a lack of funds is not an excuse, and does not extend the period of restoration.

BI coverage ceases even if repairs are not completed within a reasonable timeframe. A policyholder's failure to expedite the process or failure to

repair the damage does not extend the period of restoration. In this case, MBIC informed Mahant that repairs should not have taken longer than *"a couple of months*,"[20] a projection that appears very reasonable based on the facts and damage from a claim perspective, a period also supported by the Expert report of Randall Taylor who felt that 60 to 90 days would have been sufficient.

This claim was further complicated by the fact that Mahant failed to resume operations; instead, Dr. Patel purchased another dental practice ("the Beltline location") at a different location and operated it as a separate legal entity, a fact Mahant failed to disclose to MBIC promptly.

Since the new Beltline practice was not an insured entity, the court will need to evaluate whether the commencement of that operation was the resumption of operations by Mahant at a new permanent location. If that took place sooner than *"a couple of months,"* assuming *"a couple of months"* is also determined to be the period of restoration, Mahant's period of restoration would be reduced accordingly, since the shortest of these two time frames would be the period of restoration. Regardless, MBIC should not have paid more than the BI loss for the period of restoration.

The damage was not extensive, and according to J. S. Held's report, Rinkesh Desai said that the water was only an inch in depth. Many photos also support this report, and Servpro was able to mitigate the water damage and dry out the office quickly. Therefore, *"a couple of months"* would be reasonable from a claim-handling perspective.

While these will all be considerations for the court in evaluating the extent of Mahant's BI claim, I can undoubtedly say that MBIC's handling of Mahant's BI claim was reasonable, and in my view, MBIC overpaid.

Form 391-1003 08 16 Page 47-48 of 81 (Page 96of 197 of the PDF)

*E. Property Loss Conditions*

…

[20] Email from Steven Shands sent: Tuesday, April 18, 2023 4:32 PM to Rinkesh Desai.

*5. Loss Payment*
*In the event of loss or damage covered by this Coverage Form:*
...
***(b) We will not pay on a replacement cost basis for any loss or damage:***

***(i) Until the loss or damaged property is actually repaired or replaced;***
...

***(c) We will not pay more for loss or damage on a replacement cost basis than the least of the following amounts:***
...
***(ii) The amount that you actually spend that is necessary to repair or replace the lost or damaged property.***
...
The payment of depreciation holdback and the Mahant's failure to effect repairs promptly and resume operations are the two main issues in this claim.

While I will discuss this in further detail below, RCV holdbacks are not due and payable until two conditions are met:

**1. The property has to be physically replaced.**

**2. The property needs to be paid for, and the receipt submitted so that the amount to owed can be calculated.**

Until both conditions are met, MBIC does not owe any RCV holdback. The amount owed cannot be calculated until the actual cost incurred, meaning the amount the insured paid for the property, is documented. RCV is based on the actual selling price, not a RCV estimate.

That brings us to the various policy conditions that need to be considered.

Form 391-1003 08 16 Page 47 of 81 (Page 95 of 197 of the PDF)

*3. Duties in the Event of Loss or Damage*

*a. You must see that the following are done in the event of loss or damage to Covered Property:*
*...*
*(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.*
*...*
*(8) Cooperate with us in the investigation or settlement of the claim.*

*(9) Resume all or part of your "operations" as quickly as possible.*

These are the standard Duties in the Event of Loss or Damage. I touched on a few of these above, but they bear repeating in this case. Mahant was obligated to resume operations as quickly as possible and to cooperate with MBIC.

The policy also contains the following provision that the court will also need to evaluate:

Form 391-1003 08 16 Page 78 of 81 (Page 126 of 197 of the PDF)

*C. Concealment, Misrepresentation or Fraud*

*This policy is void in any case of fraud by you as it relates to this policy at any time.* ***It is also void if you*** *or any other insured, at any time,*
***intentionally conceals or***
***misrepresents a material fact concerning:***
*1. This policy;*
***2. The Covered Property;***
***3. Your interest in the Covered Property;***
***or***
***4. A claim under this policy.***

Given at least 14 red flags, the depth of the water, the reports of MBIC's experts, the magnitude of Mahant's claim as compared to the apparent damage, the damage apparent from the photos, Mahant's failure to resume

operations as quickly as possible, mahant's failure to notify MBIC of its resumption of operation and new facility, its conflicting emails regarding delivery of the Pano machine, and the confusion created by the purchase of a new dental practice and the transfer of property from one location to the other, if the court determines it that Mahant intentionally concealed any information or inflated its claim, there would be **no coverage** for the underlying claim.

## CLAIM HANDLING

While this claim was handled in a very professional manner, I will walk through some of the more pertinent email exchanges and comment on items of note I found in my review.

Firstly, I was disturbed by the lack of answers to simple questions throughout the deposition testimony of Dr. Patel and Mr. Desai.

The deposition testimony of Megha Patel, DDS, included the following answers:

- *"I don't know"* 75 times
- *"I can't remember"* 84 times
- *"I don't remember"* 3 times
- *"not sure"* 37 times
- *"I don't want to guess"* 7 times
- *"Unsure"* 5 times

The deposition testimony of Rinkesh Desai included the following answers:

- *"I don't know"* 68 times
- *"I can't remember"* 2 times
- *"I don't remember"* 40 times
- *"Not sure"* 44 times
- *"I don't want to guess"* 1 time
- *"Not definitively"* (or some derivative of that phrase) 5 times
    - *I would say yes for the most part but not definitively*

- *I don't want to say definitively yes*
- *I couldn't tell you definitively* – Twice
- *No, I can definitively answer that question*

Dr. Patel and Mr. Desai failed to answer basic questions, such as their education and work histories, or important matters, including when Dr. Patel began operations at her Beltline location, the date it was purchased, or any details of the purchase.

Since MBIC can only respond to a claim if it is provided with sufficient information to evaluate the claim, this lack of recall makes it extremely difficult to react to Mahants' allegations. I am therefore left to wonder how Mahant can question MBIC's handling of the underlying claim, or allege that it was mishandled.

In the following emails, claim file notes, and deposition testimony, Steven Shands is the MBIC claim handler, and David Calliham is Mahant's Public Adjuster ("PA"):

*From: SHANDS, STEVEN L.*
*Sent: Monday, September 19, 2022 2:43 PM*
*To: David Calliham <david@abbaclaims.com>*
*Subject: RE: Mahant Dental,. DBA Cotton Wood Dental, 85-00202544*

*David,*

*This is what RMC submitted.*

***From my discussions with RMC, the other dental equipment (see attached, dental equipment 2) was not damaged and was working properly at the time of the inspection. Some of it will need to be serviced, but is working property.***

*Steve Shands*
*1-508-855-7418*
*-Steven Shands, AIC (**09/30/2022** 11:36 AM) Security Type: Public*

While Mahant pursued a claim to replace dental equipment, **the equipment was working and did not appear to be damaged.** This issue runs throughout the claim. While I will not be able to comment on the damage other than to say that from the photos, it is very unlikely that the equipment could have been damaged by one inch of water:

Mass Bay 001262




11-20220817_143924

Date Taken: 8/17/2022

Mass Bay 001279




45-20220818_141419

Date Taken: 8/18/2022

Mass Bay 001307




**101-20220825_110900**

Date Taken: 8/25/2022

Mass Bay 001348



**183-Pre-Mitigation - Office#4 (Zone 1)** Date Taken: 8/14/2022

Mass Bay 001350



**188-Pre-Mitigation - Waiting RoomReception Area (**

Date Taken: 8/14/2022

From the J.S. Held report:



*ACV payment for dental equip & mitigation payment*
*9/16 - Spoke to David Calliham (PA). discussed and explained payments. There is a $12,218.78 mitigation invoice, agreed to pay half ($6,109.39) of it since the mitigation helped with the office and dental equipment.* ***I will also issue an ACV payment for the undisputed damage to the dental equipment per RMC, which totals $112,634.67.***

*Issued checks per the PA instructions and emailed copy of RMC evaluation to PA.*
*From: SHANDS, STEVEN L.*
*Sent: Friday,* ***September 16, 2022*** *2:47 PM*
*To: David Calliham <david@abbaclaims.com>*
*Cc: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Subject: RE: Mahant Dental,. DBA Cotton Wood Dental, 85-00202544*

*David,*

*I am in a position to issue some payments to include our insured's part ($6,109.39 which is half) of the mitigation invoice and the undisputed payment for damage to the dental equipment. I will forward you a copy of RMC's finding's/calculations.*

*How should the checks be issued and where should they be sent? I can e mail them and you will receive them much faster.*

*Thanks,*
*Steve Shands*
*1-508-855-7418*

Within just over 30 days of the loss, MBIC paid $112,634.67 towards the undisputed loss, plus half the cost of water mitigation, since it did not provide coverage for the mitigation of the structure. These payments were issued after discussion and agreement with Mahant’s PA, whom Mahant fired.

*contact - property manager*
*Spoke to Danny Khoshnoudi, prop. mgr. EKD Properties, 214 682-9363. he is the property manager for our insured's leased office.*

*Reviewed the lease and pointed out the lease stated that landlord is responsible for repairs at their sole expense. Danny stated insured has been on a month to month lease for about 2 years. Insured will not sign a long term lease.* ***Danny stated since insured will not sign a lease, they are not going to spend all that money to make repairs to the office only to have our insured move out. They (landlord) will not make the needed repairs. Lease also states that landlord can terminate the lease if premises are damaged****.*

*landlord did not state he was going to terminate the lease, only that they were not going to make any repairs to the office, insured can leave if they want to.*
*-Steven Shands, AIC (****10/10/2022*** *5:26 PM) Security Type: Public*

Here we can see the problems related to Mahant's lease. Since it would not commit to signing a new lease, the landlord was uncooperative. While one explanation for Mahant going month to month on its lease might have been that it intended to relocate to the new location for which it was already in discussions, it contends that it was planning to operate two practices, even though Dr. Patel was the only dentist on staff. This is another red flag.

*-Steven Shands, AIC (10/17/2022 1:07 PM) Security Type: Public*
*Loss of income payment*
*10/17 - Rec BI calculations from CPA for Mid-October.*
*Total BI is $77,850. A $25,000 advance was issued on 10/7/0222, I issued a payment for $52,850 on 10/17/2022.*
*Insured was informed of the payments and agreed.*
*-Steven Shands, AIC (12/09/2022 11:23 AM) Security Type: Public*

Here we have MBIC quickly issuing payment of Mahant's lost income for the first 60 days (*"a couple months").*

RMC - Mass Bay 000242

| | RCV | Depreciation | ACV |
|---|---|---|---|
| **BPP:** | **$ 281,734.88** | **$ 133,943.21** | **$ 147,791.67** |
| **Supplies:** | **$ 5,103.99** | **$ -** | **$ 5,103.99** |
| **TIB/Building:** | **$ 68,063.00** | **$ 11,168.84** | **$ 56,894.16** |
| **Totals:** | **$ 354,901.87** | **$ 145,112.05** | **$ 209,789.82** |

*...Parts of the unit had significant corrosion and patina and although it is not possible to "date" corrosion...*
*Recommending closure to mgmt.*
*-Stephen Johnson, CSRP, LPCS (**<u>01/30/2023</u>** 9:22 AM) Security Type: Private*

Since MBIC couldn't identify the age of the corrosion, although the water was only an inch deep and very unlikely to have caused it, MBIC couldn't prove the applicability of its corrosion exclusion. Therefore, it made the correct decision to pay for the replacement of the ProMax model S3-2D panoramic dental imaging unit. **<u>This is an example of excellent claim handling.</u>**

*revised RMC inventory*
*2/17 - Insured and RMC have been working on the damaged items. Received an revised spreadsheet from RMC with additional items added to it.*

*The revised BPP list totals $354,901.87 with $145,112.05 in depreciation for an ACV of $209,789.82. I have made prior payments of $133,744.06.*

*Note the revised RMC list includes the full Servpro123 mitigation invoice (which we agreed with PA to pay half (and issued check on 9/16/2023) and landlord would pay the other half. Landlord will not pay anything) and repairs/damage to the building. Although lease states landlord will repair damage, landlord will not.* ***<u>Agreed to go ahead and pay for building repairs so insured could reopen.</u>***

*Issued supplemental payment of $81,155.15 and informed insured of payment and e mailed insured revised RMS spreadsheet and breakdown of payments.*
*-Steven Shands, AIC (**04/10/2023** 12:19 PM) Security Type: Public*

From this email, we can see Shands working his way through the claim with RMC, MBIC's field adjuster. Notably, Shands included the RMS spreadsheets, itemizing MBIC's valuation of each piece of BPP it found to have been damaged, as payments were sent to Mahant, along with the following overall recap:

| DRAFTS ISSUED: EXP 02: BPP | | | | |
|---|---|---|---|---|
| Advance | $ 15,000.00 | 8/26/2022 | | |
| ACV per RMC worksheet | $ 112,634.67 | 9/16/2022 | reissued 10/17/2022 | |
| 1/2 ServPro mitigation Invoice | $ 6,109.39 | 9/16/2022 | reissued 10/17/2022 | |
| Supplemental per RMC revised inventory worksheet | $ 81,155.15 | 2/17/2023 | | |
| | | | | |
| | $ - | | | |
| | **$ 214,899.21** | | | $ 214,899.21 |
| **DRAFTS ISSUED: EXP 03:BI/Extra Expense** | | | | |
| Advance | $ 25,000.00 | 10/7/2022 | | |
| Per CPA calculations (thru Mid Oct) | $ 52,850.00 | 10/17/2022 | | |
| Per CPA calculations | $ 85,590.00 | 12/21/2022 | | |
| | | | | |
| | $ - | | | |
| | **$ 163,440.00** | | | $ 163,440.00 |
| | | | | $ 378,339.21 |

| | RCV | Depreciation | ACV |
|---|---|---|---|
| | | | |
| BPP: | $ 281,734.88 | $ 133,943.21 | $ 147,791.67 |
| | | | |
| Supplies: | $ 5,103.99 | $ - | $ 5,103.99 |
| | | | |
| TIB/Building: | $ 68,063.00 | $ 11,168.84 | $ 56,894.16 |
| | | | |
| Totals: | $ 354,901.87 | $ 145,112.05 | $ 209,789.82 |

*e mail from insured*
*per my phone conversation with insured on 4/7/2023, received e mail from insured with attachment.*

***Attachment is a quote from Patterson dated 12/12/2022 for dental equipment.***
***No explanation of what this represents, no explanation of what may be damaged.***

*It appears RMC has addressed some of the items already and ACV payment has been issued, so not sure what is being claimed or why sent e mail to insured:*

This is a crucial claim file note. The question of whether or not Mahant replaced this machine, paid for it, and took delivery became a sticking point and a red flag. Shands could not determine from the "Patterson **quote"** what it was supposed to represent. Shand's therefore asked Mahant for more information, which Mahant failed to provide, as documented by numerous emails, another red flag.

*From: SHANDS, STEVEN L.*
*Sent: Monday, April 10, 2023 11:16 AM*
*To: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Cc: Cottonwood Dental <cottonwooddental@cwdentalgroup.com>; SHANDS, STEVEN L.*
*<SSHANDS@HANOVER.COM>*
*Subject: FW: TRUSTED EXPERTISE. UNRIVALED SUPPORT.*

*Rink,*

*The attached quote you sent me* ***really doesn't give me any information*** *about what you believe may be wrong with a specific item that RMC did not include in their BPP list (see attached).*

*I spoke to Brandon with RMC, please provide me with the specific item (you can use RMC attached inventory and use the No. you are referring to) you are concerned about and a description of what your concern is and a photo showing the damage.*

*I will forward to Brandon, and he will review your concerns.*

*Brandon stated they have a lot of photos from their inspection so hopefully it should be easy to determine if something is damaged.*

*Thanks,*

*Steve Shands*
*1-508-855-7418*

*-Steven Shands, AIC (**04/10/2023** 1:13 PM) Security Type: Public contact - insured*

*4/7/2023 - Spoke to both insureds and reviewed the RMC spreadsheet. Insured wants to be paid for the Servpro123 mitigation invoice, explained that I agreed with PA to pay half ($6,10939, landlord would pay the other half)) of it and I did. Later* ***when it was obvious the landlord was not going to pay his half, I had RMC include it in their calculations and I issued a $81,155.15 check on 2/17/2023 that include in part the Servpro123 invoice ($12,218.78).***

***Since landlord was not going to make any repairs and insured was not holding landlord to the lease agreement, I had RMC include the MBW Servpro estimate of $55,844.22 (ACV of $44,675.38) to repair the office. This $81,155.15 check also included this ACV payment.***

***Per insured, they do not agree with RMC on their assessment of the BPP. Requested insured to send me a specific list of BPP items they disagree with RMC on and an explanation of what is wrong with the item and any photos. Insured agreed.***

*-Steven Shands, AIC (**04/10/2023** 12:53 PM) Security Type: Public*

MBIC paid for the repairs to Mahan's unit after the landlord refused to repair it on April 10, 2023, apparently after Dr. Patel had already started operations at the Beltline location, a fact not disclosed to MBIC. This is another fine example of excellent claim handling, designed to expedite the claim process and assist the insured with resumption of operations, despite the building not

being covered under the policy and even though Mahant never actually made the repairs.

*e mail to insured*
*From: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Sent: Tuesday,* ***April 18, 2023*** *4:32 PM*
*To: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Cc: Cottonwood Dental <cottonwooddental@cwdentalgroup.com>; SHANDS, STEVEN L.<SSHANDS@HANOVER.COM>*
*Subject: 85-00202544 -*

*Rink,*

***Please let me know which items are in question.***

*Also, I want to follow up with the repairs to the office.* ***During our last phone conversation, you stated you were going to repair the office at 2230 W Walnut Hill and move back to it.***

*When will this happen?* ***The repairs to this office should not have take more than a couple of months to complete.***

***It is your responsibility to resume your operations as quickly as possible.***

*Your 391-1003 08 16 BUSINESSOWNERS COVERAGE FORM states in part:*

*3. Duties in the Event of Loss or Damage*

*a. You must see that the following are done in the event of loss or damage to Covered Property:*

***(9) Resume all or part of your "operations" as quickly as possible.***
*-Steven Shands, AIC (04/18/2023 5:32 PM) Security Type: Public*

Here is a huge red flag. After paying for the cost to repair Mahant's office, Mahant failed to make the necessary repairs, despite **MBIC having paid the**

**cost to repair the structure, even though it was not covered by the policy, after being led to believe that Mahant intended to restore the insured location and resume operations.** At this point, since Mahant was seemingly refusing to make repairs promptly, MBIC was forced to cite the policy's condition of coverage.

Now, consider Rinkesh Desai's Deposition testimony during a discussion of photos of the new Beltline location:

Page 111; 24 to Page 114;12

*Q. Do you know if it's the old or new location?*
*A. I can't tell, ma'am to be honest with you, I don't know.*
*Q. Okay --*
***A. This is the new location for sure this one.***
***Q. This is new?***
*A. That one is the old location.*
*Q. 561 is the old location? Okay, alright --*
***A. This is me outside when I picked up the materials.***
***Q. Okay.***
***A. And you see how we redid the offices?***
***Q. Yep. And this is 560, this is at the new location?***
***A. Yes, ma'am.***
*Q. Okay. This is y'all painting the offices at the new location, correct?*
*A. Um-hmm, yes, ma'am.*
***Q. So if that asset purchase agreement shows that the new entity you purchased, the Beltline location for Precious Smile in September of 2022, and y'all began operating that prior to remodeling, does that mean that the new -- the new practice started operating in September of 2022 or at least in October of 2022?***
***A. I would say yes to an extent it did.***
***Q. What do you mean to an extent?***
***A.· Where we were seeing patients, we were seeing Precious Smile patients and then some emergency patients for Cottonwood Dental.***
***Q.· Okay.***
***A. I don't -- I don't know when we started -- yeah, I don't want to answer without knowing comfortably when what started.***

*Q. Let me ask you this --*
*A. I wouldn't --*
*Q. Sorry, finish your answer, I thought you were done. Go ahead.*
***A. Oh, I'm sorry I just said I wouldn't feel comfortable answering from a timeline perspective without knowing the exact timeline, right. I don't want to tell you one thing and then it ends up being a month, two months, a year or six months later.***
***Q. Okay. So you said you were seeing emergency patients for Cottonwood Dental at Precious Smile, correct?***
***A. Um-hmm, yes. I believe -- I believe they were. From a transaction perspective that really goes on Dr. Patel. But I -- I believe she was seeing patients that needed to be seen that were like emergency,*** *like, you have -- I need to go see a dentist, otherwise, there's a dental office, you know, around every corner, sometimes two around every corner.*
***Q. Okay. How far apart were the West Walnut Hill location and this Beltline location?***
***A. I couldn't give you the exact mileage, but it was less than, let's say, ten miles.***
*Q. Okay. And did Cottonwood Dental's patients get notice that Dr. Patel was going to be operate – operating her dental practice at a new location?*
*A. No. And don't quote me on that I'm not 100 percent certain about that. But I don't believe we did so, no.*
*Q. Why not?*
*A. Well, because we weren't -- we were planning to open the other practice.*

This testimony is very concerning and reveals at least two more red flags. Here, **Desai finally admits that Dr. Patel began seeing Precious Smile patients and at least some emergency patients from Cottonwood Dental in September 2022, within a month of the loss.**

**Mahant concealed this information from MBIC during the claim process**, despite being questioned about the timing of Mahant's resumption of operations and receiving multiple letters outlining that policy condition.

While Desai attempted to backtrack by reverting to "*don't quote me on that I'm not 100 percent certain about that,"* it is reasonably clear from a claim perspective that Dr. Patel resumed operations in September 2022, a fact that

was concealed from MBIC.

Desai also testified that the Beltline location was 10 miles from the insured location and that Mahant intended to operate two facilities, rather than one. However, this Google Map raises doubts about this testimony, as it clearly shows that these two locations were only 1.5 miles apart, not 10 miles apart. Which begs the question: why would Mahant set up a second location so close to the Walnut Hill location?




While the court will need to determine if these were an intentional concealment and misrepresentation, if it determines they were, the court could also void coverage for the claim.

*e mail to insured*  
*From: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*  
*Sent: Wednesday,* ***<u>April 26, 2023</u>*** *11:40 AM*  
*To: Rinkesh Desai <rinkesh.desai@gmail.com>; Cottonwood Dental <cottonwooddental@cwdentalgroup.com>*  
*Cc: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*  
*Subject: RE: 85-00202544 -*

*Rink,*

***We can talk to RMC anytime, but we need to know what you are questioning.***

*Please see the attached e mail.*

*Per my prior e mails to you and phone call.* ***You need to tell me what items are in question. I can't pick and choose which items you think are damaged from a Patterson quote. You have the worksheet from RMC (see attached), so you know what is being paid for, how much is being paid and what items were found to have no damage (or omitted).***

*RMC inspected and has a lot of photos of your dental equipment. Please let me know which items are in question. Please provide me with the specific item (you can use RMC attached inventory and use the No. you are referring to) you are concerned about and a description of what your concern is and a photo showing the damage. I will forward to Brandon, and he will review your concerns*

*You have referred to Patterson as stating certain items are damaged, please forward me any and all of Patterson's reports they have submitted regarding damage to the equipment or anything else. Also, please forward me all your actual invoices showing what you have purchased to date.*

***I also want to follow up with the repairs to the office. During our last phone conversation, you stated you were going to repair the office at 2230 W Walnut Hill and move back to it. When will this happen? The repairs to this office should not have taken more than a couple of months to complete.***

*It is your responsibility to resume your operations as quickly as possible.*

*Your 391-1003 08 16 BUSINESSOWNERS COVERAGE FORM states in part:*

***3. Duties in the Event of Loss or Damage***

***a. You must see that the following are done in the event of loss or damage to Covered Property:***

***(9) Resume all or part of your "operations" as quickly as possible***

*Sincerely,*

*Steve Shands*
*1-508-855-7418*

In these emails, we can see that the MBIC was attempting to gain clarity not only on what additional damage Mahant was claiming, but also when it would resume operations, which **never occurred.**

Below is a series of emails that I will walk through regarding Mahant's desire to be paid a sizable amount for the depreciation holdback on the ProMax model S3-2D panoramic dental imaging unit ("Pano").

As a starting point, from a claims perspective, the Patterson quote was insufficient documentation to prove that the unit had been **physically replaced and paid for**. **MBIC was not required to pay the RCV holdback until Mahant physically replaced and paid for it.**

After it was later verified that the new practice on Beltline had taken delivery of a new Pano sometime before the August 2023 J.S. Held inspection, an inspection Mahant delayed for months, even though there was still **no evidence that the machine was paid for**, other than an installment agreement revealing that "*the first payment of $1,631.31 is not due for 390 days,*" MBIC paid the holdback.

This installment agreement, along with the inconclusive nature of the Patterson quote, was a red flag. MBIC was not required to pay the holdback on the pano machine until Mahant provided documentation that it had been **replaced and paid for.** This was a large and expensive piece of equipment that is unlikely to have been damaged by one inch of water. However, just as we saw with the question over the source of the corrosion and payment of the

uncovered property damage so that Mahant could make repairs and resume operations quickly, **MBIC paid the holdback.**

Although this will be somewhat lengthy, these are essential emails to consider when evaluating how this claim was handled. I will reproduce these emails and comment as I go. This first email is Shand's response to Rinkesh Desai.

Shand's responses follow Desai's questions or statements. Shand's responses are in bold:

*From: "SHANDS, STEVEN L." <SSHANDS@HANOVER.COM>*
*To: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Cc: "SHANDS, STEVEN L." <SSHANDS@HANOVER.COM>*
*Subject: RE: 85-00202544 -*
*Date: Wed, **26 Apr 2023** 19:00:39 +0000*
*Attachments: 1-4-23_BPP_Loss_Evaluation_Spreadsheet_Mahant_Dental_BDA_Cotton_Wood_Dental.xlsx*

***Rink,***

***Are these the questions?***

*1. Will you approve the invoice that was sent for the items we ordered, if not what are the items you will not include and why (I was waiting for you to get back to us on yes we're good or no we cannot)*

***I can't say, don't think I have received an actual invoice. See March 16th e mail below, #4. Not sure what invoice you are referring to. I think all I have seen is a Patterson quote from Dec. 2022. If you have an actual invoice from Patterson where you have ordered equipment that was damaged from this loss, please forward it to me and I will review for your withheld depreciation claim.***

***You need to tell me what items are in question. I can't pick and choose which items you think are damaged from a Patterson quote. You have the worksheet from RMC (see attached), so you know what is being paid for,***

***how much is being paid and what items were found to have no damage (or omitted). RMC inspected and has a lot of photos of your dental equipment.***

***Please provide me with the specific item (you can use RMC attached inventory and use the No. you are referring to) you are concerned about and a description of what your concern is and a photo showing the damage.***

*2. We've been waiting for a loss of income since the last check, we asked that you include April as well. We would love to start our operations as soon as possible but there are too many unknowns in terms of what is covered and not covered. As you are aware we have been going back and forth on this conversation for quite some time.*

*I would love for us to close out the conversation and have a check for 600k .There is still a Loss of business we're asking for 200k (40k per month to include april as well). This is where the 800k number came from when we talked on the phone.*

***You have been paid $163,400 for loss of income; this covers through Dec 31, 2022. The DOL was 8/13/2022. The repairs to this office should not have taken more than a couple of months to complete.***

***What has been done to resume your operations?***

***It is your responsibility to resume your operations as quickly as possible.***

***Your 391-1003 08 16 BUSINESSOWNERS COVERAGE FORM states in part:***

***3. Duties in the Event of Loss or Damage***
***a. You must see that the following are done in the event of loss or damage to Covered Property:***

***(9) Resume all or part of your "operations" as quickly as possible***

*3. Schedule a meeting with RMC to review the omitted items and compare them to what Patterson is saying – I need a date from you on when we can do that if you don't want to just close things out now.*

***We can talk to RMC <u>anytime,</u> but we need to know what you are questioning. All I have seen from Patterson is a quote for some equipment. That quote does not give me any information as to what damage there is.***

***<u>You need to document and prove your claim.</u> Do you have anything from Patterson or any other company/expert stating what items/equipment is damaged that has not been considered or disputes RMC opinion/findings.***

***Please provide me with the specific item (you can use RMC attached inventory and use the No. you are referring to) you are concerned about and a description of what your concern is and a photo showing the damage.***

MBIC paid Mahant $44,675.38 to repair the structure on April 10, 2023. In the following emails, we can see that as of late May 2025, Mahant had yet to disclose the operations of Dr. Patel's new practice, which was purchased in September 2022.

From the deposition testimony of Rinkesh Desai:

*Page 24*
*Q. Okay. But you did not open up that Beltline location until after the lease at the West Walnut Hill location, correct?*
*A. I -- don't quote me on it because we were already in negotiations, we were working with them on taking over their practice. I don't remember if it was before or after.*

Page 97; 8 - 17
***<u>Q. How long after that access purchase agreement in September of 2022 did the new location open for business?</u>***

***<u>A.</u> <u>I don't remember exactly when.</u>*** *I wouldn't want to give you, like, a timeframe without knowing exact.*
*Q. Was there a period of time when the new location was closed for business due to renovations?*
*A. Yes.*
*Q. How long was that?*
*A.* ***<u>I couldn't tell you a definitively</u>*** *the total amount.*

*From: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Sent: Wednesday, May 24, 2023 8:51 AM*
*To: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>; Cottonwood Dental <cottonwooddental@cwdentalgroup.com>*
*Subject: Update on the Patterson invoice*
*Mass Bay 000280*

*Steven, wanted to get an update from you on the Patterson invoice. Were we able to get it approved and check cut?*

*Thanks*

*Rink*

*On Wed, May 24, 2023, 11:36 AM SHANDS, STEVEN L. <SSHANDS@hanover.com> wrote:*

*Rink,*

*Not sure what Patterson invoice you are referring to. Can you forward it to me?*

*Thanks*

*Steve*

*From: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Sent: Wednesday, May 24, 2023 4:23 PM*

*To: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Subject: Re: Update on the Patterson invoice*

*have two invoices that's why we created the excel sheet to get approval. There were some items on the list that were from omitted list but those need to be replaced. You reached out to consultant to confirm that's what I met with You have two invoices that's why we created the excel sheet to get approval. There were some items on the list that were from omitted list but those need to be replaced. You reached out to consultant to confirm that's what I met with him to discuss.*

*Please see excel sheet and let me know what you guys discussed today. Need to make payment but need money to do that.*

*Thanks*

*Rink*

*On Wed, May 24, 2023, 4:47 PM SHANDS, STEVEN L. <SSHANDS@hanover.com> wrote:*

*Rink,*

*Not sure what two invoices you are referring to. Please resend these invoices so I can review and confirm.*

*I did speak with the consultant this morning.* ***<u>My understanding is that he discussed with you the need to inspect</u>*** *whatever you are disputing from RMC findings. The sooner the inspection is completed the sooner we can finalize this.*

*Regarding the equipment RMC considered damaged and I have issued ACV payments (you have the list),* ***<u>if you have replaced any of these items, please forward the actual replacement invoice for review.</u>***

*Steve*

*From: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Sent: Wednesday, **May 24, 2023** 5:13 PM*
*To: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Subject: Re: Update on the Patterson invoice, 85-00202544*

***Have him come tomorrow***

*On Wed, May 24, 2023, 5:21 PM SHANDS, STEVEN L. <SSHANDS@hanover.com> wrote:*

*Rink,*

*I'll see if he can.*

*I do not know his schedule so unsure if he can make it.*

*Below is his contact information, you may want to contact him directly to schedule a time.*

*George Alexander | Senior Vice President-Regional Lead*
*J.S. Held LLC*
*15601 Dallas Parkway, Suite 1050, Addison, TX 75001*
*Office +1 972 980 5074 | Mobile +1 714 287 4438*

*From: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Sent: Wednesday, May 24, 2023 5:30 PM*
*To: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Subject: Re: Update on the Patterson invoice, 85-00202544*

*I think we need to have a serious conversation on how much more is going to be needed from us. Can you please call so we can discuss?*

*Thanks*

*Rink*

*On Thu, May 25, 2023 at 10:16 AM SHANDS, STEVEN L.*

*<SSHANDS@hanover.com> wrote:*

*Rink,*

***As you know RMC evaluated your dental equipment, you disagreed with their findings on some the equipment.***

***I retained a second expert/consultant (George Alexander) to reinspect the equipment in question in an effort to determine the condition of the equipment.*** *You spoke to Mr. Alexander a few days ago and discussed what was needed.*

***If you are going to pursue a claim on the dental equipment in question or what you refer to as "omitted" we need to determine what if any damage, there is. It will need to be inspected by Mr. Alexander.***

*If you want to finalize the claim with the information we have to date, we can discuss a final settlement.*

*Your policy states in part:*

*3. Duties in the Event of Loss or Damage*

*a. You must see that the following are done in the event of loss or damage to Covered Property:*

*(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.*

*Steve*

Mass Bay 000278
*On Thu, **May 25, 2023** at 10: 16 AM SHANDS, STEVEN L. <SSHANDS@ hanover.com> wrote:*

***I am beyond upset right now.*** *What's the final settlement amount?*

*Thanks*

*Rink*

From the deposition testimony of Rinkesh Desai:

Page 140; 11 to Page 142; 5
*Q. So you indicated that at this point in May of 20-- I'm sorry --* ***as of May 25th, 2023, when you sent this e-mail about being -- wanting to settle and I'm beyond upset right now, you're claiming that Mr. Shands already knew that Cottonwood Dental had been locked out of the Walnut Hill address, correct?***
***A. I believe so. I believe so.*** *I'll have to go back and -- I'll have to look, but I believe that is the timeframe he have already aware.*
*Q. Okay.* ***Because in response to your e-mail at the bottom he says: Regarding your claim of loss of income, is Dr. Patel practicing at another dental office, etcetera? What is the status of Cottonwood Dental? Has it reopened at 2230 West Walnut Hill Lane or had it relocated to another location? In a prior conversation you told me you were working on repairing the office at 2230 West Walnut Hill Lane.***
*A. Yeah, what was the date on that one?*
***Q. This is dated May 25th, 2023, the same date as your upset e-mail but at 3:30 -- I'm sorry -- 3:44 p.m. So --***
*A. Okay.*
*Q. -- so it's your e-mail --*
*A. That's what I was thinking we have to check what that timeline was for when that practice closed down, and it may -- to be honest, we've had so many conversations with Steven where it's gone back and forth and he may have just forgotten, I'm not sure. But I'll look for an e-mail where I've stated that the practice was shut down. I'll look for information in regards to us not having that practice anymore and I will give you an update on that. Because I don't -- has it reopened?* ***I don't remember did I even respond to that question or did I even see it.***

***Q. Well, you didn't which is what I found interesting because he specifically asking you if you're reopening at the Walnut Hill Lane or if you already have or if she's relocating Cottonwood Dental.*** *But I don't see a response where anybody tells him either we're not planning to reopen at West Walnut Hill or we're not reopening Cottonwood Dental at all because we started a new entity by purchasing a new practice instead.* ***I haven't seen any communication that's been produced that indicates that information was provided to Hanover or Mass Bay.***

While the court will need to evaluate whether this was an intentional misrepresentation by omission, voiding coverage for the claim, it is clear that **Mahant was not forthcoming regarding exactly when Dr. Patel started her operations at the Beltline location, 8 months after it was purchased, and even while being deposed years later. This is a huge red flag.**

*On Thu, May 25, 2023, 1:57 PM SHANDS, STEVEN L. <SSHANDS@hanover.com> wrote:*

*Rink,*

*This is* ***for discussion purposes only*** *and would be a comprise of a disputed claim.*

*If you want to attempt to settle, I can offer an additional payment of $215,861.12. This would be a full and final payment/settlement.*

*Steve*

*From: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Sent: Thursday, May 25, 2023 2:31 PM*
*To: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Subject: Re: Update on the Patterson invoice, 85-00202544*

*I sent you an email for the items that still need to be paid. Please pay those items and when are you paying out loss of income?*

*Thanks*

*Rink*

At this point, MBIC attempted to settle the entire claim for a lump sum. Still, in response, Mahant continued to be evasive regarding exactly what damage it believed had not been paid, while also failing to disclose Dr. Patel's Beltline operations.

Notice that **MBIC retained a second equipment expert** to evaluate the equipment even while Mahant failed to specify precisely what damage it felt was being overlooked or improperly omitted from RMC's spreadsheet.

Contrary to Mahant's allegation in the underlying lawsuit, RMC's spreadsheets, which MBIC provided to Mahant, itemized what was paid and specifically listed exactly what equipment RMC determined to be damaged, the corresponding RCV, depreciation, and ACV of each item, and, of course, by omission, revealed what MBIC and RMC did not consider to be damaged.[21]

Mass Bay 000276 - Mass Bay 000277

*On Thu, May 25, 2023 at 3:44 PM SHANDS, STEVEN L. <SSHANDS@hanover.com> wrote:*

*Rink,*

*When you refer to "items that still need to be paid" are you referring to the "omitted" items in the attached inventory? If so, you* ***understand you have disputed RMC evaluation of these "omitted" items and I have requested a reinspection of these items to determine if they are water damaged.***

***Please contact George Alexander to schedule a reinspection.***

*Regarding* ***the Patterson Installment Sales Contract, you submitted. This contract does not specify what is being purchased****. Please forward the*

[21] Mass Bay 000354 to Mass Bay 000357.

*entire contract.* ***I'm not 100% sure what is being purchased. Do you know when the equipment will be delivered to Cottonwood Dental?***

*Also, it appears the equipment is being purchased on a 72-month installment plan.*

*Your policy states in part: (Page 37 – 38, Loss Payment)*

*5. Loss Payment*

*In the event of loss or damage covered by this policy:*

*(a) We will not pay on a replacement cost basis for any loss or damage:*
*(i) Until the loss or damaged property is actually repaired or replaced;*
*(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage; and*
*(b) We will not pay more for loss or damage on a replacement cost basis than the least of:*
*(ii) The amount that you actually spend that is necessary to repair or replace the lost or damaged property.*

***Regarding your claimed "loss of "income". Is Dr. Patel practicing at another dental office, etc? What is the status of Cottonwood Dental? Has it reopened at 2230 W Walnut Hill Lane, or has it relocated to another location?***

***In a prior conversation, you told me you were working on repairing the office at 2230 W Walnut Hill Lane.***

*Steve*

Mass Bay 000275 - Mass Bay 000276

*From: Rinkesh Desai <rinkesh.desai@gmail.com>*
*Sent: Monday,* ***June 5, 2023*** *2:00 PM*
*To: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*

*Subject: Re: Update on the Patterson invoice, 85-00202544*

*Steven, Are you going to pay me in installments? I don't have money to pay for the equipment hence I need to get installments. I'm hoping you can send me the money so I can pay it off. When will you send the check to me?*

*I can't continue to do this with you for each item that we have listed to purchase. I spoke with the new consultant you hired and it seems that RMC was not / are not experts in dental equipment. Most of the items they've listed as can be repaired cannot be repaired.*

*I spent the better half of the week last week working with attorneys. They will take 40% but have guaranteed they will make sure we're whole again and they will still get their fees.* ***The PO signed in December, will have equipment delivered next month.*** *I need to get funding for that equipment prior to it being delivered otherwise I will have to get loans for these items.*

*I need the checks for these two items by EOD. There are items that are still pending (80K approximately additional) and*

*I can talk to your new consultant about what items I need to get added this week but we should try to close things out by EOW.*

*Total due today $*
*$263,739.06 from December PO*
*+ $97,787.60 Pano /(Page 5 says exactly what was purchased)*
*total = $361,526.66*

*We can make a final payment of 440k if you like to close things out today (this includes the total of 361k).*

*thanks*

*Rink*

*From: "SHANDS, STEVEN L." <SSHANDS@HANOVER.COM>*
*To: Rinkesh Desai <rinkesh.desai@gmail.com>*

*Cc: "SHANDS, STEVEN L." <SSHANDS@HANOVER.COM>*
*Subject: RE: Update on the Patterson invoice, 85-00202544*
*Date: Tue, **06 Jun 2023** 17:34:09 +0000*
*Attachments: 1-4-23_BPP_Loss_Evaluation_Spreadsheet_Mahant_Dental_BDA_Cotton_Wood_Dental.xlsx; **Pano_Machine.pdf***

*Rink,*

*The attachment (Pano Machine) has as Installment Sales Contract attached, but **nothing is signed**. There is also an invoice with an **invoice & shipped date of 4/28/2023. Have you purchased the Pano, and have you taken possession of the Pano Machine?** Hanover has paid $33,929.50 (ACV payment) toward the Pano. This is based on a replacement cost of $67,859.00. If you have actually replaced the Pano (or any other contents) and I have the proper documentation, I can release the agreed/required withheld depreciation.*

***We have discussed this many times and you have this information.** If/when you replace an item and you incur the cost, you are eligible to receive the withheld depreciation (based on the agreed value of like kind and quality). If you decide to purchase a piece of equipment over a period of time that is your decision. **Per the letter you sent me from Patterson the first payment of $1,631.31 is not due for 390 days.***

*If you have replaced items that we have agreed is damage (per the attachment), please forward the invoice(s) to me for review.*

*Your policy states in part:*

*(a) We will not pay on a replacement cost basis for any loss or damage:*

*(i) Until the loss or damaged property is actually repaired or replaced;*

*Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage;*

*Sincerely,*

*Steve Shands*
*1-508-855-7418*

*From: Rinkesh Desai <rinkesh.desai@grnail.corn>*
*Sent: Tuesday, **June 6, 2023** 10:03 PM*
*To: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Subject: Re: Update on the Patterson invoice, 85-00202544*

*Mr. Shands I have to do a payment option for the equipment because Hanover hasn't made payment yet for the machine. **The document attached that said Pano Machine.PDF indicates that not only have we purchased the Pano Machine but we have possession of it and have a payment plan associated with it.** The cost of the machine has also increased over time - the machine is now $80,453.65 and you can subtract $33,929.50 to give a new total of $46,524.15 which is now owed to Pay for the Pano Machine.*

*The invoice and Payment Plan details are included in the documentation I attached as mentioned above.*
*…*

*e mails to and from insured*
*From: SHANDS, STEVEN L.*
*Sent: Wednesday, **June 7, 2023** 12:12 PM*
*To: Rinkesh Desai <rinkesh.desai@gmail.com>; Cottonwood Dental <cottonwooddental@cwdentalgroup.com>*
*Cc: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>*
*Subject: RE: Update on the Patterson invoice, 85-00202544*

*Rink,*

*To date, you have been paid roughly $214,000 toward your dental equipment, etc.*

*With exception of the water mitigation, you have not submitted any paid invoices showing you have spent any of this $214,000. **The Patterson contract for the Pano states the first payment is not due in 390 days.***

***Have you actually incurred any expense to date for the new Pano? If so, please forward the receipts/invoices to me. Your e mail below states Mahant Dental/Cottonwood Dental has taken possession of the new Pano, this is the first time I have been made aware of this.***

***I believe you have a meeting with Mr. Don Rakow tomorrow to inspect dental equipment, Mr. Rakow will be able to confirm delivery of the new Pano to Mahant Dental/Cottonwood Dental.*** *As you know, the estimated replacement cost of the Pano you had was $67,859.00. I'll have Mr. Rakow confirm the cost of a like kind and quality of the Pano. If everything checks out, I'll issue a payment for the withheld depreciation based on the cost of a like kind and quality Pano.*

*If you have invoices you have paid from Patterson or someone else, please forward to me for review.*

*Sincerely,*

*Steve Shands*
*1-508-855-7418*

*From: Rinkesh Desai <rinkesh.desai@grnail.corn>*
*Sent: Wednesday,* ***June 7, 2023*** *12:58 PM*
*To: Don Rakow <Don.Rakow@jsheld.com>*
*Cc: SHANDS, STEVEN L. <SSHANDS@HANOVER.COM>; George Alexander*
*<galexander@jsheld.com>*
*Subject: Re: Equipment Inspection Request: Mahant Dental (Cottonwood Dental), 85-00202544, 2230*
*West Walnut Hill Lane, Irving, TX 7503*

*Hey Don,*

***We'll have to cancel our appointment for tomorrow.*** *I need to speak to my attorney on next steps and he will coordinate moving forward with you.*

*Thanks*

*Rink*

While **Mahant indicated in its email of June 5, 2023, that it would not take delivery of the Pano machine for a month, it claimed to have already taken delivery two days later.** Which was it? Similarly, while **Mahant claimed that they had already replaced the Pano machine and needed money to pay for it, the sale agreement was unsigned, and the first installment for the machine was not due for over a year**. Notably, **this was the first time Mahant provided the Patterson contract to MBIC.**

**Interestingly, as soon as MBIC informed Mahant that it would confirm delivery of the Pano machine during the inspection scheduled to take place the next day, the inspection was canceled and not rescheduled until August.**

While the court will need to evaluate if this was an intentional misrepresentation, and if it voided coverage for the entire claim, Mahant's emails of June 5, 2023, and June 7, 2023, were two huge red flags, giving MBIC every right to question and closely scrutinize the claim in the future.

Not only was there the issue of confirming delivery of the machine, but the new Beltline location operations had yet to be disclosed, which would have made any inspection problematic.

On August 1, 2023, J.S. Held inspected the insured location, which had yet to be repaired, and from which Mahant had been evicted. While Mahant took the position that J.S. Held was unqualified to inspect the equipment, J.S. Held's evaluation involved no less than four equipment experts.[22] In short, J.S. Held concluded that the water leak did not damage any of the equipment it inspected.

Mass Bay 000787

[22] Mass Bay 000263.

***According to the Insured**, on August 13, 2022, a water-related event occurred at this facility that led to equipment failure and **an accumulation of less than one inch of standing water.***

*Planmeca **ProMax model S3-2D panoramic dental imaging unit**. This unit captures maxillofacial imaging such as panoramic, true extraoral bitewing, TMJ, and sinus imaging. **The subject imaging unit had no obvious signs of water-related damage.** Examples of water-related damage would include water spots, lines, runs, pooling marks, corrosion, clumped operational dust / dirt, and / or lint, as well as shorting and arching of wiring, and heat-damaged / burnt components.*




*Three of the four hygienist trays are wall / cabinet-mounted, and the fourth unit is a rolling tray system. **These inspected units displayed no apparent signs of water-related damage.** We further discovered that one of the four track-mounted examination lights had been removed from its track since the generation of the September 7, 2022, photograph sheet. We finally reviewed a battery backup UPS unit that displayed no apparent signs of water-related damage.*

***We determined that the equipment presented for our inspection displayed no apparent signs of water-related damage. We, therefore, make no replacement recommendations for the inspected equipment.*** *However, we recommend that the equipment noted above and in Attachment A be cleaned, tested, and possibly repaired. The costs associated with this recommendation are pending receipt and review of the recommended conservative cleaning, testing, and possible repair services.*

***With regard to the above-noted pieces of equipment reportedly removed, the Insured directed us to Patterson Dental, who was retained by the Insured prior to our involvement,*** *to assess and provide replacement quotes. Although requested, the Insured has not provided any assessment reports and only replacement quotes. We subsequently contacted Patterson Dental to request any related reports and to inquire about the relocation of equipment.* ***Patterson Dental advised that they did not have any assessment reports and had not relocated any equipment.***

***SUMMARY***

***Our inspection and assessments determined that the equipment presented for our inspection and review displayed no apparent signs of water-related damage. Therefore, we make no replacement recommendations for the inspected equipment.***

While MBIC's experts reported that Desai himself noted that there had been only one inch of water, and while J.S. Held found no apparent signs of water-related damage, and made no replacement recommendations for the inspected equipment, MBIC nonetheless paid Mahant the RCV of the Pano machine.

If anything, MBIC grossly overpaid this claim, went to great lengths to appease Mahant, gave it the benefit of every doubt, and overlooked numerous red flags that would have justified a fraud investigation.

Here are some of the red flags:

1. Mahant's failure to repair the insured location, even after being paid for uncovered damage, and after giving MBIC the impression that it intended to make repairs;

2. Mahant's failure to inform MBIC that Dr. Patel had resumed operations at the Beltline location;

3. Business Personal property relocated from Mahant to Dr. Patel's new Beltline practice is another red flag;[23]

4. Mahant was going month to month on its lease, making it possible that Mahant intended to close down and begin operating as a new PLLC even before the loss;

5. Mahant had already entered into discussions to purchase a new PLLC before the loss. While Mahant contends that it was planning to operate two practices, Dr. Patel was the only dentist on staff;

6. Even after Desai admitted that Dr. Patel resumed operations in September 2022, only a month after the loss during his deposition testimony, Desai attempted to backtrack;

7. The fact that Dr. Patel resumed operations in September 2022, only a month after the loss, was concealed;

8. The Beltline location was only 1.5 miles from the insured location, calling into question Mahant's statement that it intended to operate multiple facilities, and discrediting his testimony that these two locations were 10 miles apart (really two more red flags);

9. Mahant claimed damage to items above the water line, while J.S. Held's equipment experts found no damage;

10. Mahant claimed damage to electronic circuitry far above the water line, while J.S. Held's equipment experts found no damage;

---

[23] Red flags are fraud indicators. While one or two red flags are not necessarily a reason for alarm, if there are more than three red flags, the claim should undergo a Special Investigation by the insurer's SUI department.

11. The "Patterson quote" was not sufficient documentation to inform MBIC of the replacement of damaged equipment, yet Desai continued to demand payment;

12. After informing Rinkesh Desai that J.S. Held would verify delivery of the Pano machine during J.S. Held's inspection that was scheduled to take place the next day, Mahant immediately called off the inspection and failed to reschedule it for months;

13. The unsigned Patterson installment agreement/contract outlined no payments for over a year; and

14. Mahant's conflicting emails of June 5, 2023, and June 7, 2023.

MBIC handled this claim in accordance with all insurance industry standards and gave Mahant the benefit of every doubt. Any criticism of MBIC's claim handling is severely misplaced.

My compensation is based on an hourly rate. My hourly compensation is $500 per hour.

I reserve the right to supplement this disclosure with additional opinions or to update these opinions to the extent that new information is discovered or disclosed. I reserve the right to rebut the opinions and testimony of other experts and witnesses presented at trial.

June 04, 2025 — *Louis G. Fey Jr.*
Date — Louis G. Fey Jr. CPCU, CIC, AIC

# CURRICULUM VITAE

**LOUIS G. FEY JR, CPCU, CIC, CRM, AIC** **FEY CONSULTING LLC**

Address: 2136 N Woodchase Court
Baton Rouge, Louisiana 70808
(225) 362-0018
Lfeyjr@yahoo.com

## BUSINESS

Insurance consulting, expert testimony, litigation support, licensed insurance producer and adjuster

- Industry practice (claims, underwriting, agency and company operations), standards, means, methods, errors and omissions
- Coverage expert
- Multi-line claim issues and disputes
- Business Interruption Coverage
- Fair Claim Handling Standards and Practice
- Insurance Industry Standards and Practice
- Insurance Underwriting Standards and Practice
- Defense strategy with regard to insurance issues
- Contractual provisions and CRT analysis as it relates to insurance as well as additional insured concepts
- Insurance Agency Errors and Omissions

## EDUCATION

1981 **B.B.A. Bachelors of Business Administration –** University of Cincinnati

1985 **Certificate in General Insurance -** INS

1994 **Associate in Claims -** AIC

1995 **Chartered Property Casualty Underwriter -** CPCU

2003 **Certified Insurance Counselor –** CIC

2014 **Certified Risk Manager** – CRM

Each of the above designations is the result of countless hours of study and classroom participation. For example, the Chartered Property and Casualty Underwriter (CPCU) designation is awarded upon completion of ten (10) courses of study covering every facet of the property casualty insurance industry. The classes are very comprehensive

and the CPCU designation is the highest and most respected designation in the industry. The Certified Insurance Counselor (CIC) designation is a five (5)-course program encompassing very technically advanced studies of commercial property and casualty insurance coverage and agency operations. The Associate in Claims (AIC) designation is a multi-course program whose course work includes property and casualty coverage and claim handling. Lastly, the Certified Risk Manager (CRM) designation is a five (5)-course program covering every facet of the Risk Management Process. These are all graduate level studies and each course is approximately 20 hours in length. These designations are granted only after the successful completion of all courses and the related examinations. These programs have been recognized as graduate level studies by major universities.

**Deemed qualified to testify, based upon Daubert, on a wide range of insurance matters by the following courts:**

- The Superior Court of Fulton County- State of Georgia – (twice)
- The United States District Court of Mississippi - Southern District (twice)
- United States Bankruptcy Court, Eastern District of Louisiana
- 19th Judicial District Court, Parish of Baton Rouge, State of Louisiana (twice)
- The United States District Court for The Northern District of Georgia, Atlanta
- 40th Judicial District Court for The Parish of St. John the Baptist, State of Louisiana
- The United States District Court, Eastern District of Louisiana (six times)
- The United States District Court, Northern District of Florida
- The Civil District Court for the Parish of Orleans, State of Louisiana (two times)
- The Circuit Court of Jefferson County, State of Alabama
- The 29th Judicial District Court Parish of St. Charles, State of Louisiana
- The United States District Court, Western District of Louisiana (5 times)
- 23rd Judicial District Court For The Parish Of Assumption, State Of Louisiana

- The 9th Judicial District Court Parish of Rapides, State of Louisiana
- The 14th Judicial District Court Parish of Calcasieu, State of Louisiana
- Commonwealth of Puerto Rico Court of First Instance Superior Court of Arecibo
- United States District Court Southern District Of Mississippi Northern Division

**EXPERIENCE:**

2007 – Present **FEY CONSULTING LLC**

- Consultation on Risk Management opportunities
- Assist clients on claim, coverage, and insurance disputes
- Act as a liaison and consultant for insureds and insurers
- Contractual Risk Management and CRT assistance
- Technical resource for producers, insureds, and insurance companies
- Expert witness testimony
- Litigation strategy
- Mediation assistance and negotiation

2007 – Present **Cadence Insurance, an Arthur J. Gallagher Company, Baton Rouge, LA**
**Vice President of Risk Management**

- Consultation on Risk Management opportunities
- Licensed P&C and L&H producer
- Assist clients on claim, coverage, and insurance issues
- Act as a liaison and consultant for clients and carriers
- Contractual Risk Management and CRT assistance
- Technical resource for producers, clients, and carriers
- Agency E&O Risk Management resource

Plaintiff's expert on bad faith, unfair claim practices, proper investigation, the use of experts. (Deposition June 2021)

- Cyber Practice Leader

2000 – 2007 **St. Paul/Travelers Insurance, Atlanta, GA**
**Director of Major Case – Construction Claims Services**

- Handled very large exposure and complex liability cases

- Mentored, directed, and oversaw multiple Construction Claim Regions
- Directed investigation and litigation, negotiated settlements, attended trials and mediation; coverage and contract analysis and interpretation

1996 – 2000 **Lumber Mutual Ins. Co., Greer, SC**
**Regional Claims and Underwriting Manager, Southern Region**

- Trained, organized, and implemented this start-up claims operation
- Oversaw claims for Southern Region
- Oversaw Underwriting Department in the Southern Region
- Managed a staff of over 40 people
- Handled large exposure cases, all lines
- Handled large exposure lawsuits; including mediations, negotiations, and trials
- Negotiated and implemented managed care program
- Implemented a WC telephonic nurse program for in-house managed care
- Developed a triage program to reduce the frequency of surgery on W.C. claims

1981 – 1996 **Ohio Casualty Ins. Co., Hamilton, OH**
**Senior Claims Supervisor**

- Oversaw litigation and claims in both Home Office and Branch Office settings
- Oversaw Hurricane Andrew cleanup
- Developed and implemented training for adjusters
- Conducted various instructional seminars for adjuster training
- Member of the company's "Swat Team" (Cleanup of distressed offices)

While with Travelers and Lumber Mutual, I personally handled all major case liability claims for the Southeast United States which included complex losses involving catastrophic injuries and property damage. While at Ohio Casualty, I was a member of the company's "SWAT" team charged with cleaning up distressed claim offices across the country, instituting sound claims practices based upon industry standards, re-training the staff, and returning those claim operations to acceptable levels of

operation in compliance with those industry standards. While at Travelers, I was also responsible for mentoring, overseeing, and training the claim staff.

**RELATED EXPERIENCE**

- Licensed Adjuster for over 40 years
- Licensed Property Casualty Producer
- Licensed Life & Health Producer
- FEMA/NFIP Licensed Flood Adjuster
- Past Chairman of the State of Louisiana Property Casualty Insurance Commission
- Past member of the State of Louisiana Insurance Commissioner's Advisory Council
- Past member of The State of Louisiana Cyber Security Commission
- Past member of the State of Louisiana Auto Insurance Task Force
- Past Vice Chairman of the State of Louisiana Hurricane Mitigation Commission
- Past member of the State of Louisiana Commercial Motor Vehicle Insurance Task Force
- Past President the Professional Insurance Agents of Louisiana (PIA)
- Past Chairman of the Governmental Affairs Committee of the PIA of Louisiana and current member
- Named PIA of Louisiana's Agent of the Year 2013/2014
- Certified WIND Umpire
- Past member of the faculty of The National Alliance for Insurance Education and Research (The National Alliance)
- Assisted in authoring the Claims Manual for Ohio Casualty's Claim Department in the mid 1980's

- Assisted in authoring various coverage endorsements for Lumber Mutual Insurance and Travelers Insurance

- Participated on the Louisiana Citizen's subcommittee which addressed numerous operational and claim processes within that operation and offered recommendations for improvement

- Co-Chair of the Louisiana Hurricane Mitigation Commission (Senate Concurrent Resolution 7 - SCR 7)

- Member of the Louisiana Commercial Motor Vehicle Insurance Task Force (Senate Concurrent Resolution 19)

I have been acting as an insurance consultant and expert witness since September 2007 and have evenly balanced my litigation support efforts between insurance defense, and plaintiff's work. Much of my efforts have been as a claim consultant on both litigated and non-litigated matters assisting both clients and insurers with coverage interpretation, claim handling, defense strategy, negotiations, contract interpretation, insurance underwriting, policy placement, procurement, and agency operations.

**Seminars given on insurance coverage and related issues**

- Commercial General Liability Coverage –CGL Coverage, Conditions, Exclusions and Endorsements

- Occurrence Law – Various Jurisdictional Interpretations and Their Effect on CGL Coverage

- Occurrence Law – Manifestation, Multiple or Continuous Triggers

- Additional Insured Endorsements and Related Issues

- Certificate of Insurance Issues

- Contractual Defense and Indemnity Provisions, The Anti-Indemnity Statutes of Various Jurisdictions and How They Interact With The Contractual Related Provisions of The CGL Policy

- Contractual Provisions to Look for: What To Include in Contracts and How They Impact One's Liability Exposure and Insurance Coverage

- Waiver of Subrogation Contractual Provisions and Policy Endorsements

- Professional Liability Endorsements

- WC Immunity, The Statutes Regarding Statutory Employer Status; How They are Treated in Various Jurisdictions and their Impact on CGL Coverage
- Excess/Umbrella Coverage and Related Issues
- Litigation Management
- Negotiations and Mediation
- Claim Operation Policy and Procedures – Fair Claims Practice
- Business Interruption issues and considerations
- Louisiana Indemnity
- Effectively Managing The Claims Process
- Perils & Pitfalls with Additional Insured (AI) Endorsements
- Coverage "Gaps" and "Traps" – August 19, 2013 – Jackson Mississippi
- Cyber Liability: Could You Be At Risk? June 6,2013 – Baton Rouge, Louisiana
- Professional Liability Insurance for Engineers – Engineering Law Seminar – Half Moon Education – June 20, 2013 - Baton Rouge, Louisiana
- Managing Cyber Risks, Threats & Insurance Implications – April 30, 2013 – Gulfport Mississippi
- Do You Have A Cyber Liability Exposure? June 6, 2013 - Baton Rouge, Louisiana
- Agent's Duty – August 8, 2013 – Jackson, Mississippi
- Cyber Liability: What You Need to Know – November 14, 2013 – Webinar
- Certificates of Insurance – February 26, 2013 – Baton Rouge, Louisiana
- Employee Leasing: A Construction Industry Perspective (For the ABC – New Orleans, Louisiana)
- Cyber Liability: What You Need To Know (Jackson Ms.)
- Contractual Indemnification and Additional Insured Issues (Jackson Ms.)

- Insurance For Vetrepreneurs – LSU Entrepreneurship Boot Camp For Veterans With Disabilities – Stephenson Entrepreneurship Institute
- Essentials of Cyber Insurance
- No Driver No Pilot, Who Can We Sue?
- Agent's E&O – (For the Louisiana Department of Insurance & Southern University) (August 2018)
- Cyber Insurance - A Growing Concern
- The Blueprint 2022 - A Construction Industry Seminar – Builders Risk, WOS, Contractual D&I, Additional Insured, CGL policy, Cyber
- The Blueprint 2023 - Modern Insurance Products
- Agent's E&O – How to Protect Your Agency (For the Professional Insurance Agents of Louisiana July 2023)
- Property and Liability Insurance and Indemnity – Do's and Don'ts in Contracts - Presented to the Louisiana State Bar December 2023

**ARTICLES**

- IRMI Update: Risk Management & Insurance Commentary, Tips, and Tactics February 6, 2013 I Issue 287 I ISSN: 1530-7980 - "Don't Use ATIMA in Builders Risk Policies"
- Droning On About Drones – The Agent's Voice - Vol. XLII. No. 10 December 2015
- What Has Happened to the Insurance Industry? PIA Agents Voice December 2007, republished by the CPCU Society (CLEW), and by InsuranceCommentary.com
- The Case for Paying COVID BII Claims - InsuranceThoughtLeadership.com

**CONTINUNG EDUCATION**

- Life and Health Institute
- Agency Management Institute
- Commercial Property Institute
- Personal Lines Institute
- Ruble Graduate Seminar 11/6/2004
- Ruble Graduate Seminar 8/16/2006

- Commercial Casualty Institute
- Principles of Risk Management
- Practice of Risk Management
- So you want to be an expert witness?
- Insuring Defective Construction
- Contractual Liability, What's Covered and What's Not?
- Commercial Property Insurance and Risk Management
- Commercial Liability Insurance and Risk Management
- Principles of Risk Management and Insurance
- Issues in Insurance
- Insurance Economics
- Insurance Company Operations
- Insurance Issues and Professional Ethics
- Insurance Accounting and Finance
- Insurance Company Management
- Commercial Underwriting: Principles and Property
- Principles of Suretyship
- Liability Claim Practices
- Property Loss Adjusting
- Principles of Insurance – Liability Claims Adjusting
- Principles of Insurance – Property Loss Adjusting
- Casualty Insurance
- Property Insurance
- Louisiana Life and Health Pre-licensing
- Solutions to Disagreements over Time Element Claims
- Surprise and the Other Three "S" Words That Result in Time Element Disagreements
- Everyday Ethics
- Calculating Business Interruption
- The Law after Katrina: The Good, the Bad and the Ugly
- Practical Application of Ethics
- Wind Umpire Certification 11th Annual Windstorm Insurance Conference 2010
- National Flood Insurance Program Adjusters Certification
- Gulf Coast Case Law Update: Louisiana, Texas, Mississippi
- Florida Property Insurance Law Update
- Evaluating Storm Losses
- Disarming the Bad Faith Bomb
- Documenting the Claim

- A Claim Professional’s Guide to “Outside the Box” Thinking
- Time Element Claims
- Director's Officer's Liability/Cyber Liability
- Property Insurance for Contractors
- A Detailed Review of Provisions of the CGL
- Personal Lines QA
- 2010 Insurance Coverage Update
- Insurance Coverage Issues in the CGL Policy - Emerging Issues for the next Decade
- Environmental Risk Management and Insurance Strategies
- How to Be an Agent Advocate at Claim Time
- The Insurance Industry: Today’s Trends, Tomorrow’s Opportunities
- Workmanship “Occurrence”
- Position Yourself as an Insurance / Risk Management Expert
- Directors and Officers Liability
- Estate Planning Techniques: Gifts, Trusts and Family Limited Partnerships
- National Health Care Reform
- Navigating Marine Workers Compensation
- Intangible Property Risk Management For Business Enterprises
- Cyber Liability Insurance: What It Covers and Who Needs It
- Flood: Levee and Rising Water
- The Internet
- Principles of Risk Management
- Analysis of Risk
- Control of Risk
- Financing of Risk
- Practice of Risk Management
- Introduction to Implementing and Monitoring the Risk Management Process
- The Risk Manager
- Building the Risk Management Team
- Information and Technology for Risk Managers
- Allocating Cost of Risk
- Due Diligence During Organizational Change
- Executive Risk Management
- Enterprise Risk Management
- Reputation and Brand Management
- NFIP Adjuster Certification – 2014
- Wage & Hour /Other Issues
- Introduction to Directors and Officers Liability Insurance
- Introduction to Employment Practices Liability
- Understanding Cyber Liability
- An Introduction to Errors and Omissions Liability
- Retaining Top Talent
- Rewards and Recognition

- Team Dynamics
- Work / Life Balance
- Coaching & Counseling
- D&O: A Dozen Dangerous Details
- Conflict Resolution
- Commercial Crime
- Arson and the Insurance Contract
- Fiduciary Liability, ERISA Fidelity, and Employee Benefits Liability Exposures and Coverage and Coverage
- Personal Jewelry Insurance – Underwriting for Ethical Valuation

**TEXTBOOKS (PARTIAL LIST)**

- Casualty Claim practice – Donaldson 4th addition
- Claims Operations: A Practical Guide
- Casualty Claim Practice – Hirsch & Donaldson - Fifth edition
- Principles of Risk Management and Insurance – Williams, Head, Horn, & Glendenning – Volumes I & II
- James J. Markham, et al., The Claims Environment (1st ed., - Insurance Institute of America 1993
- Doris Hoopes - The Claims Environment (2nd ed., - Insurance Institute of America 2000)
- Property Loss Adjusting (Vol. I & II) (2nd ed.) By James J. Markham and Insurance Institute of America (Jul 1995)
- General Insurance - Bickelhaupt – Tenth Edition
- Issues in Insurance – Randall
- Commercial Liability Risk Management and Insurance – Malecki, Horn, Wiening, Donaldson – Volumes I & II
- Claims Operations: A Practical Guide Explanations and Illustrative Examples of Technical Claim Issues, Practices, And Management - by Michael T. Murdock, CPCU, ARE, ARM, ACI, ASLI
- An Introduction to Liability Claims Adjustment by Corydon T. Johns
- Human Relations in Handling Insurance Claims – Irwin Series in Insurance and Economic Security – by Willis Park Rokes
- Casualty Claim Practice by James H. Donaldson - Revised Edition

**GENERAL INFORMATION**

Louis G. Fey Jr. is a second-generation insurance professional living in Baton Rouge, Louisiana, the son of an attorney and claims manager.

## EXPERT TESTIMONY IN THE LAST FOUR YEARS

Gustave J. Labarre, Et Al., Plaintiffs vs. Occidental Chemical Company, Vulcan Materials Companys, Texas Brine Corporation, Et Al., Defendants. In The Circuit Court For The Twenty-Third Judicial District Court Parish Of Assumption State Of Louisiana Case No.: 33,796, Division "A" Defense expert on bad faith, unfair claim handling practices, insurance industry standards and practice, insured contracts, CGL coverage, the handling of conflict claims, “Chinese Wall” and independent counsel, litigation management, and legal bill audit (Deposition and trial testimony July 2022)

Susan Russo Marchand, Et Al. vs Occidental Chemical Company, Vulcan Materials Companys, Texas Brine Corporation, Et Al., In The Circuit Court For The Twenty-Third Judicial District Court Parish Of Assumption State Of Louisiana Case No.: 34,270 Division "A" Defense expert on bad faith, unfair claim handling practices, insurance industry standards and practice, insured contracts, CGL coverage, the handling of conflict claims “Chinese Wall” and independent counsel, litigation management, and legal bill audit (Deposition and trial testimony July 2022)

Texas Brine Corporation In The Arbitration Proceedings with Occidental Chemical Company, LLC, In AAA Arbitration No. 69 20 1300 0129 Defense expert on bad faith, unfair claim handling practices, insurance industry standards and practice, insured contracts, CGL coverage, the proper handling of conflict claims, “Chinese Wall” and independent counsel, litigation management, and legal bill audit (Arbitration testimony March 2022)

Dr. Mary Maitland Deland V Bankers Insurance Company, Et Al24th Judicial District Court Parish Of Jefferson State Of Louisiana Docket No. 774-127 Division "B" Plaintiff’s expert on Bad Faith, fair claim practices, NFIP claims, NFIP coverage restrictions, Agency E&O, failure to procure, the standards applicable to a consultative broker, and the availability of insurance in the market (Deposition October 2020)

Jeffrey S. Salter Plaintiff, vs. Carlisle Walker Limehouse, Jr., Laurie A. Larson, UNUM Insurance Company, UNUM Life Insurance Company of America, Tailwind Reinsurance Company, Provident, Life and Accident Insurance Company, UnumProvident Corporation, Unum Group, ET. AL. Defendants State Of South Carolina In The Court Of Common Pleas Fifth Judicial Circuit County Of Richland Case No. 2017-CP-38-05631 Plaintiff’s expert on Bad Faith, fair claim practices in handling Disability Claims, improper denial of benefits (Deposition February 2021)

L N Parkwood Company, Plaintiff vs. Texas Farmers Insurance Company, Defendant United States District Court Southern District Of Texas Civil Action No. 4:18-CV-04219 Plaintiffs expert on the NFIP, NFIP claim handling standards, and property insurance claim handling standards and practice. (Deposition February 2021)

Ace American Insurance Company, Plaintiff, V. Orion Restoration-Storm Division, LLC, Defendant And Third-Party Plaintiff, V. Maydelin Martell Agency, Inc. And Angel Gonzalez, Third-Party Defendants. In The State Court Of Henry County State Of Georgia Civil Action No. 16SV253EDB. Defense expert of agency E&O, the Risk Management Best Practices applicable issuance and vetting Certificates of insurance. (Deposition February 2021. Trial testimony August 2023.)

Ashley And Benjamin Remick, Plaintiff(s), Versus Travelers Home And Marine Insurance Company, Defendant(s). In The United States District Court For The District Of South Carolina Spartanburg Division C.A. NO.: 7:19-CV-02524-BHH Plaintiff's expert on Bad Faith, fair claim practices, property claim handling, improper denial of benefits (Deposition March 2021)

Lancer Insurance Company, Plaintiff, V. Jet Executive Limousine Service, Inc.; Philadelphia Indemnity Insurance Company; United States Liability Insurance Company; Cooper-Global Chauffeured Transportation, Inc.; Hennessy Transportation, Inc.; Steven Hoppenbrouwer; Kent Plowman; Steven Taylor; Rick Tomcho; Thomas Matthesen; Sahil Raina; Robin Raina; Wesley Hudson; Stephen Farrar; Georganna Gullia; Joseph Best; Jessica Barnes; John Mason; Kenny Strickler; Tim Sheehy; Scott Armstrong; Brian Dill; Alan Cooling; And Ray Shreyas, Defendants. United States District Court Southern District Of Georgia Augusta Division Case 1:18-CV-00136-JRH-BKE. Defense expert on bad faith, unfair claim practices, Auto insurance coverage. (Deposition April 2021)

Conure Telecom Services, LLC, Plaintiff, V. American Trust Administrators, Inc., Companion Life Insurance Company, Laurie Upchurch and Associates, LLC, and Laurie Upchurch, Individually, Defendants. In The Superior Court of Fulton County, State of Georgia, Civil Action No: 1:19-CV-2019CV317999. Plaintiff's expert on the duties and responsibilities of a Third Party Administrator (TPA), agency E&O, Self-Insured Health Benefits Insurance programs with stop loss coverage. (Deposition April 2021)

Rap Indy LLC And MSI Lyndhurst Indianapolis Grocery LLC, Plaintiffs, Vs. Zurich American Insurance Company And The Travelers Indemnity Company, Defendants. Indiana Commercial Court In The Marion Superior Court, County Of Marion, State Of Indiana, Cause No. 49001-1910-PL-044570. Plaintiff's expert on bad faith, unfair claim practices, red flags, proper investigation, an insured's obligation to trigger coverage. (Deposition May 2021)

Day Enterprises, Inc., Plaintiff, v. Pennsylvania Lumbermens Mutual Insurance Company; And Brown & Brown of Oklahoma, Inc., Defendants. In The District Court of Creek County State of Oklahoma Case No C J 2020-138. Plaintiff's expert on bad faith, unfair claim practices, proper investigation, the use of experts. (Deposition June 2021)

New Orleans Equity, L.L.C. D/B/A Galatoire's Restaurant and Galatoire's 33 Bar & Steak Plaintiffs, v. U.S. Specialty Insurance Company Defendants. United States District Court Eastern District of Louisiana Civil Action 20-1935. Plaintiff's expert on bad faith, unfair claim practices, improper investigation. (Deposition June 2021)

Church of the King of Lake Charles v. GuideOne Mutual Insurance Co U.S. District Court Western District of Louisiana (Lake Charles) CIVIL DOCKET FOR CASE #: 2:20-cv-01514-JDC-KK. Defense expert on bad faith, unfair claim practices, insurance industry standards and practice, the appraisal process (Deposition September 2021)

RPG Hospitality, LLC, Plaintiff, v. Ironshore Specialty Insurance Company; Marsh & Mclennan) Agency, LLC D/B/A J. Smith Lanier & Co.; And Janet Johnson, Defendants. In The Superior Court of Richmond County State of Georgia Civil Action No.: 2019-RCCV-00452. Plaintiff's expert on bad faith, unfair claim practices, insurance industry standards and practice, underwiring reformation. (Deposition October 2021)

Wayland Collins, Candy Kelly, and Alvin Polk, Plaintiffs, v John C Benton D/B/A Q & M Motor Transports, Mark Ingle and Northland Insurance Company Defendants, in The United States District Court for The Eastern District Of Louisiana, Civil Action NO. 2:18-CV-07465. (Defense expert on staged accidents, claim investigation, claim handling, and the identification of red flags as fraud indicators – (Trial testimony - November 2021)

Transamerica Life Insurance Company Versus Bruce Fuselier Jr. And Tonya I. Gegenheimer in The 24th Judicial District Court For The Parish Of Jefferson State Of Louisiana. CASE NO. 759-140. (Plaintiff's expert on Life Insurance claim handling, bad faith, concursus actions, Declaratory Judgement actions, paying the policy proceeds into the court on contested claims. (Deposition November 2021)

Eddie Campbell and Wilma Jean Campbell, Plaintiffs v. Frasure Creek Mining, LLC., Lexington Coal Company LLC., Big Elk Mining Company LLC., Lexington Insurance Company, Et. al., Defendants. For the Commonwealth of Kentucky, Perry Circuit Court, Civil Action No.: 08-CI-418 Plaintiff's expert on bad faith, unfair claim practices, insurance industry standards and practice. (Deposition December 2021)

Rutledge Investments, LLC and Brady Rutledge Versus Scottsdale Insurance Company. United States District Court Western District of Louisiana Lake Charles Division Civil Action No. 2:21-Cv-00364 Defense expert on bad faith, unfair claim practices, insurance industry standards and practice (Deposition January 2022)

Jean Murray, Plaintiff, Vs. State Farm Fire and Casualty Company and Russ Hewitt, Defendants. In The United States District Court for The District of South

Carolina Orangeburg Division Civil Action No.: 5:19-CV-01795-MGL Plaintiff's expert on bad faith, unfair claim practices, insurance industry standards and practice, agency E&O. (Deposition November 2021)

Brandon Ward and Mika Ward, Husband and Wife, Plaintiffs, V. Allstate Insurance Company, Defendant. In The Circuit Court of Marshall County, West Virginia Civil Action No. 20-C-127 Defense expert on bad faith, unfair claim practices, insurance industry standards and practice (Deposition February 2022)

CRU Shreveport, LLC, Plaintiffs, v United Specialty Insurance Company, Defendants. In The United States District Court for The Western District of Louisiana Action No. 5:18-CV-00751 Plaintiff's expert on bad faith, unfair claim practices, insurance industry standards and practice. (Deposition December 2021)

In The Arbitration Capstone Associated Services, Ltd., Capstone Associated Services (Wyoming), Limited Partnership, and Capstone Insurance Management, Ltd., PoolRe Insurance Corp., The Feldman Law Firm LLP, and Stewart Feldman, individually, Claimants, v. St. Charles Surgical Hospital, L.L.C.; St. Charles Holdings, L.L.C.; Center for Restorative Breast Surgery, LLC; Sigma Delta Billing, LLC, Sunrise Productions, LLC, Cerberus Insurance Corp., Janus Insurance Corp., Orion Insurance Corp., Scott Sullivan, and Frank DellaCroce, Before Mr. Mark Glasser, Arbitrator – Defense expert on insurance claim handling, claims made and reported coverage triggers, and red flag indicators of suspicious claim activity. (Arbitration Testimony August 2021)

Malouf-Carr L.P. V.  Zurich American Insurance Company In The United States District Court For The Northern District Of Mississippi Greenville Division Case No. 4:21-Cv-30-DMB-JMV Plaintiff's expert on bad faith, unfair claim practices, insurance industry standards and practice (Deposition March 2022)

Mt. Hawley Insurance Company, V Daniel Island Riverside Developers, LLC, Carriage Hill Associates Of Charleston, LLC, Robert Behringer, Di Associates, LLC, And The Oaks At Riverside North Property Owners Association, Inc., In The United States District Court District Of South Carolina Charleston Division Case No. 2:21-cv-1932-RMG. Defense expert CGL coverage, coverage interpretation, illusory coverage (Deposition August 2022)

Brookhollow Holdings, LLC And Brookhollow Operations, LLC, Plaintiff, V Travelers Property Casualty Company Of America Defendant. In The United States District Court Eastern District Of Louisiana Civil Action: 2:20-Cv-02445. Plaintiff's expert on bad faith, unfair claim practices, prompt and through investigation, insurance industry standards and practice. (Deposition March 2022)

Massachusetts Bay Insurance Company, Plaintiff, V. D.C. J.D. Corporation, D/B/A Markey Insurance Group and Michael Branch Henderson, Defendants. Defense

expert, agency E&O, claim reporting by an agent, agency Best Practices (Deposition July 2022)

Gustave J. Labarre, Jr., V Occidental Chemical Company & Texas Brine Company, LLC., 23rd Judicial District Court For The Parish Of Assumption State Of Louisiana Case No. 33,796, Division: "A." Defense expert on bad faith, unfair claim handling practices, insurance industry standards and practice, insured contracts, CGL coverage, the handling of conflict claims, “Chinese Wall” and independent counsel, litigation management, and legal bill audit (Trial testimony April 2022) Massachusetts Bay Insurance Company, Plaintiff, V. D.C.J.D. Corporation, D/B/A Markey Insurance Group And Michael Branch Henderson, Defendants. Plaintiff’s expert on claim evaluation, insurance industry standards and practice, agency E&O. (Deposition June 2022)

Ryan Auto Group Of Monroe, LLC D/B/A Ryan Honda And Ryan Chevrolet, Inc., Plaintiffs, vs Breck Construction Company, Inc, Architecture Associates, A Professional Corporation, S. E. Huey Co., A Professional Corporation, And Dreher Contracting, LLC, Defendants. 4th Judicial District Court Parish Of Ouachita State Of Louisiana Case No. 2016-2803 Defense expert on reservation of rights, claim handling standards and practice, Commercial General Liability (“CGL”) coverage (Deposition June 2022)

The Administrators Of The Tulane Educational Fund Versus Illinois Union Insurance Company; Willis Towers Watson Southeast, Inc. F/K/A Willis Of Tennessee, Inc.; And ABC Insurance Company, Defendants. State Of Louisiana Civil District Court For The Parish Of Orleans. Docket No. 2021-00826. Plaintiff’s expert, bad faith, Agency E&O, Binder Procedure (Deposition August 2022)

Rashid Sandhu, And Southwest Georgia Bank, Plaintiffs, V. Greene Insurance Agency, Inc., and Amguard Insurance Company Defendants. In The Superior Court Of Lowndes County State Of Georgia Civil Action file No.: 2018CV1322. Defense expert, Agency E&O, Loss payee, Underwriting (Trial deposition August 2022)

Appalachian Community Federal Credit Union Plaintiff, V. Cumis Insurance Society, Inc.; Defendant United States District Court, Eastern District Of Tennessee, Northern Division. Dkt No. 3:20-CV-0553. Plaintiffs expert, bad faith, abdicating claim handling to defense counsel (Deposition August 2022)

Sugartown United Pentecostal Church, Inc., V Church Mutual Insurance Company, In The United States District Court For The Western District Of Louisiana Lake Charles Division Civil Action No. 2:21-CV-01672. Defense expert, bad faith, Proof of Loss, reasonable claim investigation (Deposition and trial testimony August 2022)

Toll Brothers, Inc., A Delaware Corporation; Toll Land XX Limited Partnership, A California Limited Partnership; and Toll Ca VIII, L.P., A California Limited

Partnership, Plaintiffs, V. ACE American Insurance Company, A Pennsylvania Corporation; Superior Court Of The State Of California County Of Orange – North Justice Center Case No. 30-2020-01152770-CU-IC-NJC. Plaintiffs expert on Bad faith, Unfair claim practices, coverage evaluation, improper denial. (Deposition testimony October 2022)

Hertz Investment Group, LLC And Hertz Lake Charles One, LLC, Plaintiffs v Zurich American Insurance Company And American Guarantee And Liability Insurance Company Defendants. 14th Judicial District Court For The Parish Of Calcasieu State Of Louisiana. Case No. No. 2020-4406 Division D. Plaintiff's expert property insurance claim handling, insurance industry standards and practice, unfair claim practices bad faith, the underwiring of large property policies, blanket v specific, RCV, ACV, agreed value, SOV's, misrepresentations of coverage (deposition and hearing testimony October 2022)

Lion Copolymer Geismar, LLC And Lion Copolymer Holdings, LLC V. Aptim Maintenance LLC, Zurich American Insurance Company, Illinois Union Insurance Company, And General Cable Industries, Inc. 23rd Judicial District Court For The Parish Of Ascension State Of Louisiana No. 122,525 Division: "D" Plaintiff's expert regarding Commercial General Liability ("CGL") coverage, insurance industry standards, unfair claim practices, bad faith (Deposition February 2023)

Eric S. Dobkin, Barbara B. Dobkin, and The Dobkin Family Foundation Plaintiffs, -Against- Hub International Limited And Hub International Northeast Limited Defendants. Supreme Court Of The State Of New York County Of New York Index No. 650444/2022. Plaintiff's expert on agency E&O, a broker's standard of care, Cyber Insurance coverage. (Deposition March 2023)

Autonomous Municipality Of Manatí Plaintiff, V. Triple-S Property. Inc. Defendants Commonwealth Of Puerto Rico Court Of First Instance Superior Court Of Arecibo Civil No. Mt2020cv00224 Plaintiff's expert on the underwriting of agreed valued property insurance programs, bad faith, unfair claim practices, E&O endorsements. insurance claim handling standards and practice, estimates related to FEMA grant programs, property insurance underwriting (Deposition testimony March 2023, Trial testimony June 2023)

American Arbitration Association - Texas Brine Company, LLC, Claimant v. Occidental Chemical Corporation, Respondent. Case No. 01-19-0001-7699 Panel/Arbitors: Colombaro, Cohen, Remele. Plaintiffs expert regarding the insurance industry standards, customs, and practice applicable to General Liability and Excess liability claim handling and coverage for claims involving Commercial General Liability ("CGL") and Excess Liability policies (April 2023)

Bayou Automotive Group, LLC D/B/A Bayou Chrysler. Dodge Jeep Ra1vj: And Bayou State Automotive Group, LLC D/B/A Bayou Ford Versus New York Marine And General Insurance Company, Hub International Midwest Limited D/B/A : Hub

International Gulf South, David W. Alligood, Janette Campbell, and XYZ Insurance Company. 19th Judicial District Court Parish of East Baton Rouge State of Louisiana Docket No.: 712867 Section: 23. Plaintiff's expert property insurance claim handling, insurance industry standards and practice, unfair claim practices, bad faith, the underwiring of property policies, Hurricane moratoriums, underwiring standards and ethics, Agency E&O (Deposition testimony October 2023, trial testimony April 2024)

Michael E. Blake v. John Hancock Distributors LLC F/K/A Manulife Financial Securities LLC, The Lincoln National Life Insurance Company, State Farm Life Insurance Company, Quest Diagnostics Clinical Laboratories, Inc., and Examone Worldwide, Inc. In The 24th Judicial District Court For The Parish Of Jefferson State Of Louisiana Case No. 823-577 Plaintiff's expert on Life Insurance Rating, Underwriting, and the procurement process. (Deposition testimony November 2023)

Macon Division First Solar Electric, LLC, Plaintiff, v. Zurich American Insurance Company, Defendant. In The United States District Court For The Middle District Of Georgia Case No.: 5:21-Cv-00408-MTT. Plaintiff's expert on property insurance claim handling, the standards applicable to a thorough investigation, coverage interpretation, and claim file notes. (Deposition testimony November 2023)

Jai Mahadev, L.L.C. Versus Amguard Insurance Company United States District Court Middle District Of Louisiana. Civil Action No: 22-Cv-0344. Plaintiff's expert, bad faith, unfair claim practices, property insurance claim handling standards and practice (Deposition testimony December 2023)

Plenary Infrastructure Belle Chasse, LLC V Aspen American Insurance Company. United States District Court Eastern District Of Louisiana Civil Action No. 2:22-Cv-02666-Cjb-Mbn. Plaintiff's expert, bad faith, unfair claim practices, bond claim handling standards and practice (Deposition testimony January 2024)

Benjamin Harwood Versus Nelson Burton, Progressive Paloverde Insurance Company And Allmerica Financial Benefit Insurance In The Civil District Court For The Parish Of Orleans Case No. 2015-3284. Defense expert, bad faith, unfair claim practices, UM/UIM claim handling standards and practice (Deposition testimony March 2024)

3371 Reading, LLC, Plaintiff V. Liberty Mutual Group, Inc., And The Ohio Casualty Insurance Company, Defendants. In The United States District Court For The Southern District Of Ohio (Cincinnati Division) Case No. 1:22-Cv-00062. Plaintiff's expert, bad faith, unfair claim practices, property insurance claim handling standards and practice, property insurance underwriting, protective safeguards (Deposition testimony March 2024)

Houston Casualty Company, Plaintiff, V. Trident Construction Services, LLC,

Defendant. In The United States District Court For The District Of South Carolina Charleston Division C/A No.: 2:22-Cv-2037-Mbs. Plaintiff’s expert, bad faith, unfair claim practices, Commercial General Liability insurance claim handling standards and practice. (Deposition testimony March 2024)

MAPFRE PRAICO Insurance Company vs Commonwealth of Puerto Rico, for itself and on behalf of the Department of Correction and Rehabilitation Estado Libre Asociado De Puerto Rico Tribunal De Primera Instancia Sala Superior De Bayamón Case No. BY2019CV005160. Plaintiff’s expert, bad faith, unfair claim practices, property insurance claim handling standards and practice (Deposition testimony June 2024)

Alexandria Division Avoyelles Parish Sheriff’s Office  Plaintiff, Versus  Diamond State Insurance Company  Defendant. United States District Court Western District Of Louisiana Alexandria Division Civil Action No.: 1:22-Cv-02863 Plaintiff’s expert, bad faith, unfair claim practices, property insurance claim handling standards and practice, fraud, concealment (Deposition testimony June 2024)

The Pentecostal Church Of Dequincy Versus Church Mutual Insurance Company, S.I. United States District Court Western District Of Louisiana Lake Charles Division Case 2:22-Cv-02782. Plaintiff’s expert, bad faith, unfair claim practices, property insurance claim handling standards and practice (Deposition testimony June 2024)

First Pentecostal Church Of Leesville, Inc. Plaintiff Versus Church Mutual Insurance Company, S.I. In The United States District Court Western District Of Louisiana Lake Charles Division Civil Action No. 2:22-Cv-03859. Plaintiff’s expert, bad faith, unfair claim practices, property insurance claim handling standards and practice (Deposition testimony June 2024)

Silvia Ortiz As Guardian For Luis Ortiz Vega Disabled Adult, Elizabeth Ortiz Rivera Minor Child, Karen Ortiz Rivera Minor. Child, Laura Ortiz Rivera Minor Child, And The Estate Of Cole Hatcher, By And Through Tanya Greene And Virgil Larios As Personal Representatives; Plaintiff(S) Vs Shentasha Bybee, Michael Wornell, And Doe I To X, Defendants In The District Court Of The Fifth Judicial District Of The State Of Idaho, In And For The County Of Jerome Case No.: Cv27-19-00620. Plaintiffs expert on Insurance Claim Handling standards and practice, Bad Faith, Policy limit demands, insufficient limits, multiple competing claims (Deposition July 2024)

Columns Hotel Owner, LLC D/B/A The Columns Hotel Versus Certain Underwriters At Lloyd's, London Et Al Civil District Court For The Parish Of Orleans State Of Louisiana Case No: 2022-07847. Defense expert on Insurance Claim Handling standards and practice, Bad Faith, proper investigation, contents claims (Deposition August 2024)

Direct General Insurance Company, Plaintiff, V. Christopher Evans And Polina Denissova, Individually And As Co-Administrators Of The Estate Of Andrew Evans, Roger Hartsfield And D. Max Hirsh, As Administrator Of The Estate Of Shannon Hartsfield, Defendants. United States District Court For The Northern District Of Georgia Atlanta Division. Civil Action File No: 1:23-Cv-03491-ELR. Plaintiffs expert on Insurance Claim Handling standards and practice, Bad Faith, Policy limit demands, insufficient limits, multiple competing claims (Deposition August 2024)

Providence Brooks LLC v United National Insurance Company In The United States District Court Middle District Of Louisiana Docket No. 2:23-CV-00833-ILRL-KWR. Defense expert on Insurance Claim Handling standards and practice, Bad Faith, proper investigation, Insured's Duties After Loss or Damage. (Deposition September 2024)

Jeffrey Arcement And Lisa Arcement versus USAA Casualty Insurance Company United States District Court Eastern District Of Louisiana Civil Case No.: 2:22-Cv-2788. Plaintiffs expert on insurance claim handling standards and practice, Bad Faith, Reservation of rights, late payment, contents claims (Deposition August 2024)

Stephanie Lewis versus State National Insurance Company, Inc., D/B/A QEO Insurance Group, David Degruy, Richard's Disposal, Inc., and State Farm Mutual Automobile Insurance Company In The Civil District Court For The Parish Of Orleans State Of Louisiana Case No. 2017-11114. Defense expert on Insurance Claim Handling standards and practice, Bad Faith (Deposition September 2024 – Trial testimony October 2024)

Peiffer Wolf Carr Kane Conway & Wise LLP, Plaintiffs, Versus Valley Forge Insurance Company Defendants. United States District Court Eastern District Of Louisiana Civil Action: No. 23-6235. Plaintiffs expert on insurance claim handling standards and practice, the standards applicable to insurance coverage interpretation, Bad Faith, late payment (Deposition October 2024)

Smile Baton Rouge Office Condominium Association, Inc. and Dr. Nelson Daly, Plaintiffs, vs Hanover Insurance Company Defendant. 19th Judicial District Court Parish Of East Baton Rouge State Of Louisiana Case No. C-737023 "32" Defense expert on Insurance Claim Handling standards and practice, Bad Faith (Deposition December 2024)

AJs Shoes Outlet LLC Versus Independent Specialty Insurance Company, Certain Underwriters At Lloyds, Other Insurers Subscribing To Binding Authority 8604510568622021 24th Judicial District Court Parish Of Jefferson
State Of Louisiana Case: 826-534 Div: "F" Plaintiffs expert on insurance claim handling standards and practice, Bad Faith (Deposition and Arbitration testimony November 2024)

Cherly Dabney Versus Blain Gregoire And America First Insurance Company In The 23rd Judicial District Court Parish Of Ascension State Of Louisiana Case No. No. 103,615 Plaintiff's expert on Insurance Claim Handling standards and practice, Underwriting, Bad Faith (Deposition testimony December 2024, Trial testimony January 2025)

Sagar Thakore And Vina Thakore Versus Rebecca T. Angelle And Shelter Mutual Insurance Company In The 15th Judicial District Court Parish Of Lafayette State Of Louisiana Docket NO. 20223032 DIV. "A". Defense expert on Insurance Claim Handling standards and practice, Bad Faith (Deposition testimony February 2025)

Crow Family, Inc., Crow Holdings Capital Partners, L.L.C., Anatole Partners Iii, L.L.C., And Windsor Court Hotel Partners, L.L.C., Plaintiffs, V. Allianz Global Risks Us Insurance Company, Endurance American Specialty Insurance Company, Continental Casualty Company, Starr Specialty Lines Insurance Agency, Westchester Surplus Lines Insurance Company, Arch Specialty Insurance Company, And Landmark American Insurance Company, Defendants. In The District Court Of 134th Judicial District Dallas County, Texas. Cause NO. DC-23-18094. Plaintiff's expert on Insurance Claim Handling standards and practice, Underwriting, Bad Faith (Deposition testimony February 2025)

Starr Indemnity & Liability Insurance Company Plaintiff V. River & Roads Directional Drilling, LLC; Ethan Parker; And Matthew Tyler Feldman, United States District Court Southern District Of Mississippi Northern Division Case 3:23-CV-00215-CWR-LGI Defense expert on Insurance Claim Handling standards and practice, Underwriting, Bad Faith (Deposition, Trial testimony April 2025)

# EXHIBIT B

## INDUSTRY STANDARDS

Insurance industry standards have been developed by the insurance industry and apply to claim handling in all jurisdictions. These standards are generally accepted industry principles all adjusters and insurers are expected to follow, understand, and apply to their everyday claim practice. While state statutes will sometimes impact these standards, and these standards must always comply with such statutes, invariably, these well-founded standards are at least as stringent as those placed upon the industry by each individual state. Some standards were developed as reasonable methods of addressing insurance matters through years of industry study, discussion, and practice, while others were developed over time due to court decisions or other industry developments impacting common practice. All state unfair claim practice standards are in line with these industry standards. Obviously, insurers must have a justifiable reason to deny a claim and must treat an insured's interests with at least the same regard as its own. An insurer must handle claims in accordance with these standards.

These industry standards can be seen in various documents and books. These standards can be found in insurance company internal Best Practices, which are almost always protected from general circulation, and are only produced through court order subject to confidentiality agreements. Some can be found posted on the Internet, such as "State Farm's Claim Handling Standards", and some can be found in industry textbooks and related study guides created for teaching these standards to adjusters. The National Association of Insurance Commissioners (NAIC) has also created a formal list of **minimum** fair claim practice standards, developed from common practice and these often-cited industry standards.

I have helped to develop these standards for insurers over the years, and I have also reviewed many different insurer Claim Handling Guidelines or Best Practices, through my work as an expert witness. While protected by confidentiality agreements, I can state these standards are all essentially the same. While some are more comprehensive than others, there is a tendency in the industry to either not publish these standards at all, or to only put in writing very general guidelines which are closely protected so they cannot be used against the insurer during litigation.

Adjusters are taught to be honest and forthright when handling claims and to treat the interests of the insured with at least the same regard as the interests of his or her employer's (the insurance company). Just as one would need to understand the training and expectations of other professionals (for example doctors, lawyers, and accountants) to be able to evaluate their actions, one must also be able to understand the expectations and training received by adjusters to be able to evaluate how they should act, as compared to how they have acted in handling a claim. Likewise, adjusters are trained to apply these insurance industry principles to coverage interpretation. To understand if an insurer has acted reasonably in its coverage determination or claim handling, one must understand the parameters within which an adjuster works, and the principles that apply to that work.

While parts of applicable statutes might be similar to some of the insurance industry standards I discuss, there are differences. These insurance industry standards are broader, and encompass additional issues not addressed by statutes. In short, these standards set the tone for how insurers and their adjusters are required to approach and handle claims.

For example, in the James J. Markham book, The Claims Environment, used in the Associate in Claims curriculum, the author outlines some of the following well-foundedand long-standing industry standards (emphasis added):

*Page vii - "Claims representatives….are the people responsible for fulfilling the insurance company's promise."*

*Page 5 - "A special relationship is formed between the insurance buyer and the insurance company in an insurance transaction."*

*Page 6 - "When a covered loss occurs, the insurance company's obligation under its promise to pay is triggered. The claim function should ensure the prompt, fair, and efficient delivery of this promise."*

*Page 9 - ". . . the primary function of a claim representative is to pay promptly and fairly . . ."*

*Page 13 - ""The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims." "Because of the personal relationship formed in an insurance transaction, the insurance company should not place its interests above the insured's." "The claim professional handling claims should honor the company's obligations under the implied covenant of good faith and fair dealings."*

*Page 17 - "No honest and reputable insurer has either explicit or implicit "standing orders" to its claim department to delay or underpay claims."*

*Page 18 - "It is to the insured that the insurance company owes the contractual obligation of utmost good faith and fair dealing."*

*Page 19 - "Claim representatives handling first-party losses should promptly pay all amounts they know the insurer owes and should negotiate in a forthright, honest, and flexible manner over any amounts that are in dispute."*

*Page 29 - "An investigation must often be undertaken to fully develop the facts needed to determine coverage. Good faith claim practices require that this investigation be objective, thorough, and timely."*

*Page 31 – "The insurance company's failure to advise the insured of the coverage problem at the beginning of the claim adjustment process will most likely prevent the company from later denying coverage to the insured."*

*Page 235 - "claim representatives must know what the law of bad faith is, how it evolved, and how it affects everyone in the claims business. More important, they must know how to investigate, evaluate, and settle claims in a way that protects the interests of both the insured and the insurer and avoids the problems that lead to bad faith claims"*

*Page 270 – "An insurer that fails to properly investigate, evaluate, negotiate, and settle third-party claims exposes its insured to excess verdicts and exposes itself to bad faith claims."*

*Page 274 – 278 "When an insurance company fails to pay claims it owes or engages in other wrongful practices, contractual damages are inadequate. It is hardly a penalty to require an insurer to pay the insured what it owed all along."… "All insurance contracts contain a covenant of good faith and fair dealing."… "If bad faith is a tort in a third-party claim, it should be a tort in a first-party claim as well."… "Insurance is a matter of public interest and deserves special consideration by the courts to protect the public."… "Insurance contracts are not like other contracts because insurers have an advantage in bargaining power. Insurers should therefore be held to a higher standard of care."… "Recovery for breach of an insurance contract should not be limited to payment of the original claim."… "The public's expectations are elevated by insurers' advertising, slogans, and promises which give policyholders the impressions that they will be taken care of no matter what happens." "Policyholders buy peace of mind and are not seeking commercial advantage when they buy a policy. In addition, they are vulnerable at the time of the loss."… "Policy language is sometimes difficult to understand. The benefit of interpretation should be given to the policyholder."…*

*Page 300 - "Upper management also has a responsibility to maintain proper claim- handling standards and practices."*

## <u>COVERAGE</u>

From Claims Operations: A Practical Guide / Chapter 13: Coverage Issues

*Coverage Analysis*

***It is very important that the adjuster and claims manager evaluate coverage with the objective to provide coverage and not to deny coverage.*** *The policyholders paid premium dollars for the coverage, and the only time they will receive any benefit is when a claim occurs.* ***The claims professional should explore all available opportunities for coverage, carefully reviewing all coverage forms and endorsements. If the claims professional's coverage evaluation is geared toward a determination as to how a claim can be denied, then the adjuster may not be treating the policyholder fairly and may also be engaging in unethical behavior.***

## <u>INVESTIGATIONS</u>

When investigating a claim insurance companies cannot exhibit tunnel vision, to the exclusion of all evidence to support the claim, but neither should it ignore evidence supporting denial or rejection. When evaluation coverage, insurance companies should never assume facts that are not supported by concrete evidence, must never mischaracterize evidence to its benefit to the

detriment of the policyholder, and insurers must always objectively evaluate claims based upon **all** available evidence developed during the investigation.

The adjuster must be even handed, and the insurance company owes obligations to other stakeholders, such as stockholders, and other insureds, to ensure the company's liquidity and profitability. That said, these competing interests should never take precedence over the interest of the insured, and all evidence must be given equal weight. The insurance adjuster's job is to pay what is owed, no more, and no less.

In the Second Edition of The Claims Environment, (Doris Hoopes, 2000, Insurance Institute of America, AICPCU/IIA, page 10.7) the author explains some of the requirements of good faith claim handling, such as an unbiased investigation:

*"Claim representatives should investigate in an unbiased way, pursuing all relevant evidence, especially that which establishes the legitimacy of a claim. Claim representatives should avoid using leading questions that might slant the answers. In addition, they should work with service providers that are unbiased…Investigations should seek to discover the facts and consider all sides of the story. Claim representatives should not appear to be looking for a way out of the claim or for evidence to support only one side."*

Page 9.2:

*"Insureds purchase insurance to pay for losses, for peace of mind, and to benefit society by reducing social burdens. When insurers do not provide those benefits of insurance , they cause just the opposite: unpaid losses, great stress, and burdens on society."*

Below is an excerpt from an International Risk Management Institute, Inc. (IRMI) article on the subject:

*"Utmost good faith, honesty, openness, and mutual assistance benefit both parties inthe long run. An open discussion of policy benefits is consistent with this principle.* ***Preserving the integrity of insurance as a public policy objective is obstructed not advanced, in an atmosphere of secrecy, deception, and exploitation of the other party's inexperience or ignorance. To overcome this "Gotcha!" threat, from a public policy perspective, the public interest element implies that an altruistic motive lies behind the insurance mechanism. Consistent with this notion, some observers see a fiduciary relationship in the public interest quality of the insurancemechanism, while others describe it as at least quasi-fiduciary. Either is supportiveof an insured's "right to know" the benefits of the bargain."***[1]

And as Jessica Wynn and Andrea McIntyre explained in their joint dissertation on adjuster ethics:[2]

### *I. Ethics in Claims Handling*

[1] International Risk Management Institute ("IRMI") - Current Trends and Issues September 2008 Tim Ryles.

[2] Ethical Rules and Responsibilities for Claim Adjusters.

> ***The work of adjusting insurance claims engages the public trust. Accordingly, claim adjusters are held to a high ethical standard.*** *Adjusters must put the duty for fair and honest treatment of the claimant above the adjuster's own interests in everyinstance. As the Florida Supreme Court eloquently stated:*
>
> *An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to and settlement,* ***then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. The insurer must investigate the facts,*** *give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.*

The industry requires that all claim files be constructed in a manner such that all investigation, coverage evaluations, damage evaluations, negotiations, settlements, payments, pertinent communications, and correspondence are documented in a way to allow the reproduction of claim handling by any auditor or claim management, so that the claim can be properly supervised, or so that a newly assigned adjuster can understand the claim resolution strategy. Each claim file must contain reports and file notes documenting all significant activities, interactions, or events, and the file should reflect prompt and professional claim handling with reasonable evaluations, adequate reserves, and attempts at resolution or a reasonable resolution strategy.

As mentioned, the National Association of Insurance Commissioners has promulgated a set of minimum standards based upon the insurance industry's custom and practice. These standards were developed with input from, and in consultation with, not only various state insurance commissioners from across the country, but also representatives from the insurance industry. These standards are used to train adjusters and are included in adjuster training curriculum. These are also some of the standards applied by insurance departments across the country when evaluating insurer compliance. They are considered minimum standards of behavior which most reputable insurers strive to exceed. These standards are referred to as the NAIC "Unfair Claims Settlement Practices." Section 4. Of the Model Act defines Unfair Claims Practices as:[3]

> *A. Knowingly misrepresenting to claimants and insureds relevant facts or policy provisions relating to coverages at issue;*
>
> *B. Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies;*
>
> *C. Failing to adopt and implement reasonable standards for the prompt investigationand settlement of claims arising under its policies;*

[3] NAIC Model Laws, Regulations, Guidelines and Other Resources—January 1997 © 1997 National Association of Insurance Commissioners

*D. Not attempting in good faith to effectuate prompt, fair and equitable settlement ofclaims submitted in which liability has become reasonably clear;*

*E. Compelling insureds or beneficiaries to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them;*

*F. Refusing to pay claims without conducting a reasonable investigation;*

*G. Failing to affirm or deny coverage of claims within a reasonable time after having completed its investigation related to such claim or claims;*

*H. Attempting to settle or settling claims for less than the amount that a reasonable person would believe the insured or beneficiary was entitled by reference to written or printed advertising material accompanying or made part of an application;*

*I. Attempting to settle or settling claims on the basis of an application that was materially altered without notice to, or knowledge or consent of, the insured;*

*J. Making claims payments to an insured or beneficiary without indicating the coverage under which each payment is being made;*

*K. Unreasonably delaying the investigation or payment of claims by requiring both aformal proof of loss form and subsequent verification that would result in duplication of information and verification appearing in the formal proof of loss form;*

*L. Failing in the case of claims denials or offers of compromise settlement to promptly provide a reasonable and accurate explanation of the basis for such actions;*

*M.Failing to provide forms necessary to present claims within fifteen (15) calendardays of a request with reasonable explanations regarding their use;*

*N. Failing to adopt and implement reasonable standards to assure that the repairs ofa repairer owned by or required to be used by the insurer are performed in a workmanlike manner.*

Since insurance companies are expected to comply with these insurance industry standards along with any applicable state requirements, I use these standards to evaluate the handling of claims, along with consideration of the involved insured's obligations and responsibilities in the claim process, including those outlined by the insurance policy, the most important of which are to promptly report all claims, to cooperate, and to be forthcoming.

## **CLAIM HANDLING**

Typical claims-handling functions include:

- To investigate the existence of all relevant policies;
- To avoid any appearance of a conflict of interest;
- In a first party property setting, to investigate the efficient proximate cause of loss;
- To investigate contributing factors that lead to damage or injury;
- In a third-party claim, to identify, evaluate and quantify the culpability of all involved;
- To gather and evaluate facts to verify coverage;
- To try to find a reasonable path to coverage;
- To thoroughly evaluate all damages;
- To obtain a non-waiver agreement and to fully disclose any coverage defense identified to the insured immediately upon identification, but prior to continuing the claim investigation;
- Drafting and issuing complete and accurate reservation of rights (“ROR”) and denial letters to policyholders, but only when necessary, where a reasonable path to coverage (“read in coverage”) cannot be identified, and then only where there is no reasonable interpretation of the policy defense identified negating its applicability to the claim;
- Policy defenses cited in ROR letters must be quoted accurately, and their applicability to the claim must be explained clearly;
- Denial letters must be complete and accurate, issued only after the completion of a full, prompt, and thorough investigation, with all policy defenses identified, clearly explained;
- Setting loss reserves and revising them to reflect the insurance company's probable exposure and expected claim payment;
- In a first party setting, adjuster’s must pay all **undisputed** amounts promptly;
- In a third-party setting, adjusters must attempt to negotiate and settle claims promptly, once liability has become reasonably clear;

- To evaluate subrogation potential and to pursue recovery; and
- To monitoring, oversee, and direct the defense of liability claims or coverage litigation.[4]

An adjusters duties include:

- Conducting claim investigations in a diligent search for facts and coverage as promptly as possible;
- Giving a prompt, courteous, and forthright explanation to each claimant as to the Company's position with respect to his/her claim;
- To conclude each claim on the basis of its own merits in the light of facts, the law, and the coverage afforded;
- To pay meritorious claims promptly;
- To ensure that the insured receives all benefits available under the policy;
- At the management level, to carefully supervise and direct all claim activity to ensure compliance with all claim handling standards.
- To listen, be fair, be open, and carry out the insurer's part of the bargain under the insurance policy in good faith, and to deal fairly with all claimants;
- To be familiar and in compliance with those laws and regulations that apply to claims in the applicable jurisdiction;
- Explain all relevant coverage under the policy. Encourage policyholders to report all losses, and to avail themselves of all policy benefits;
- To diligently investigate the facts to determine if a claim is valid, to reasonably evaluate the claim, and to act promptly in resolving it. If it is necessary to reject a claim for any reason, it should be done promptly and courteously, with a thorough an accurate explanation of the decision; and
- To make an objective evaluation of the facts and circumstances supporting a policyholders' claim.

*K. Payment of Undisputed Damages*[5]

*There will be times in a claim investigation when a portion of damages is due and owing to a named insured, mortgagee or lienholder, or other party, while remaining damages are in controversy concerning the extent or amount or to whom payment is owed.*

*To protect insurers from potential claims of bad faith, it is important once coverage is determined to be due and owing on all or a portion of the claim, payment is made as promptly as possible. Insurance companies may be held liable for bad faith damages if the carrier admits payment was due and owing to one or more insured parties under the contract but failed to make timely payment while other portions of the claim remained under investigation or other amounts remained in controversy. Withholding payment on any portion of a claim or to any insured where an insurance carrier reasonably owes coverage, depending upon the jurisdictional laws, may constitute bad faith.*

---

[4] Conflicts And The Tripartite Relationship.
[5] Insurance Committee For Arson Control. Page 19

*There has been an increasing number of insurance bad faith claims filed where even though payment on the claim has been made, the allegation of bad faith is the insured took too long to issue payment or delayed payment because the carrier did not have a good faith basis for the investigation to have occurred or to proceed.*

**BURDEN OF PROOF**[6]

> *In an insurance contract, the insured must show that an event or circumstance falls within an insuring agreement. This initial* ***burden of persuasion*** *is merely being able to show that* ***the existence of a fact is more probable than not.*** *Once the insured accomplishes this task,* ***the onus of proving the applicability of an exclusion or other coverage limitation shifts to the insurance company.***

**SPECIFIC RULES FOR INSURANCE POLICIES**[7]

> *Insurance policies are particular kinds of contracts that are made in a special relationship between the insurer and the policyholder. They have a unique structure and format which is different than other contracts…*

*Coverage Grants Construed Broadly*

> *The first special rule of contract interpretation that is specifically applicable to insurance policies is that the provisions in an insuring agreement are to be construed liberally or expansively in favor of the policyholder.*

*Burden of Proof as to Coverage Is on the Insured*

> *The relationship of the parties under an insurance policy is different than the relationship between the parties under other kinds of contracts. Essentially, an insurance policy is a promise by the insurer to pay for covered claims under the stated terms and conditions if and when they should occur. The insurer is not going to know if and when the policyholder suffers a loss that may be covered under the policy. When that happens,* ***it is incumbent on the policyholder as the only party with knowledge of the loss to initiate the claim process.*** *Certainly, the unknowing insurer will not do it for him.*
>
> *There is an old saying in the law that he who alleges must prove. If the policyholder is the one who must notify the insurer of a loss and allege that the loss is covered under the policy, the burden of proof will be on the policyholder to marshal the evidence necessary to sustain his claim. The policyholder can do this by, among*

---

[6] How to Draft and Interpret Insurance Policies - Ch. 8: Insuring Agreements and Exclusions.

[7] Insurance Law Essentials Chapter 7: Policy Construction Rules © 2000-2021 International Risk Management Institute, Inc. (IRMI). All rights reserved.

*other things, submitting oral or written statements, giving a deposition, and hiring experts to give a report to the insurer. The policy's proof of loss provisions provide some ground rules for the policyholder to follow when trying to carry his burden of proof so that the process will be somewhat uniform for all issued policies.*

*For first-party policies providing named-perils coverage, the policyholder's evidentiary burden means that he must submit proof that the loss was caused by one of the enumerated perils. If his evidence is not convincing enough, the insurer need not respond to the claim at all, but merely deny it on the basis that the proof was insufficient. If necessary, the parties can submit the question of whether or not the policyholder's proof is sufficient to establish that the loss was caused by a covered peril to a jury to decide.*

***The insured's burden is significantly less for first-party policies providing "all risks" or "open perils" coverage. These kinds of policies cover all losses that are not specifically excluded. <u>What this means is that the policyholder must merely prove that a loss happened.</u> After that, the burden automatically shifts to the insurer to prove that the loss is somehow excluded.***

*Exclusions Construed Strictly*

***Whereas insuring agreements granting coverage are construed liberally and expansively, exclusions from that coverage are construed strictly and restrictively.*** *Again, the idea is to maximize the utility of an insurance policy as a means to protect the average consumer from catastrophic losses…*

*Burden of Proof as to Exclusions Is on the Insurer*

*If he who alleges must prove, then it follows that insurers who allege that a loss is excluded should bear the burden of proving it. Insurers can do this in a number of ways. They can hire investigators or other experts to accumulate evidence and give reports. They can take recorded statements or depositions of the insured. They can submit documents, like blueprints or photographs, for the court's consideration.* ***All the burden and expense of proving the application of an exclusion must be borne by the insurer.***

## <u>NON-WAIVER AGREEMENTS AND RESEVATION OF RIGHTS[8]</u>

*II. COVERAGE QUESTIONS PROCEDURES – OVERVIEW*

***After a claim is presented, we may obtain information indicating a coverage questionexists. A coverage question may exist when the facts indicate the claim may not be covered under the policy.*** *Coverage questions may also*

[8] State Farm's Operations Guide.

*involve violations of policy conditions. Acts of the insured at the time of policy application may also affect coverage.*

***A claim specialist aware of a coverage question must be careful to avoid forfeiting the insured's and the Company's rights by speaking or acting improperly. The rights of the insured and the rights of the Company may be influenced by the doctrines of waiver andestoppel.***

...

*To avoid waiver or estoppel, the insured is put on notice that a coverage question ispresent. The most common method to effect this notice is to obtain a non-waiver agreement from the insured or send a Reservation*

*of Rights letter.*

*You need to know the law on waiver and estoppel in your jurisdiction.*

*Ill. NON-WAIVER AGREEMENT – DESCRIPTION*

*A non-waiver agreement is a* ***document that puts the insured on notice of the potential of non-coverage. The document also reflects an agreement between theinsured and the Company. The insured agrees that the non-waiver allows the Company to continue the claim-handling process.*** *Action taken in investigating, negotiating, settling, denying, defending, or ascertaining the amount of loss or damage will not waive any rights of the Company, including the right to deny coverage. The Company agrees that theinsured's rights under the policy are not waived.*

*IV. NON-WAIVER PROCEDURES*

*A. When to Take a Non-Waiver*

*First-Party Claim*

*In a first-party claim, we are responding to a claim made by our insured. The insured is requesting that we investigate all aspects of the claim including the issueof coverage. By investigating the coverage issue, we are not waiving any of our rights. In fact, we are taking the action that we are obligated to take by our contract.*

***We still have to be aware of the doctrine of estoppel and make sure our actions orwords do not lead the insured to reasonably believe that there is coverage when there is not.***

***A non-waiver should be taken if there will be a protracted time period between theinitial investigation and the decision concerning coverage, or if the facts of***

***the claim indicate that securing a non-waiver is prudent.***

***Consult management if there is any question whether or not a non-waiver shouldbe obtained.***

*B. From Whom to Take a Non-Waiver*

*A non-waiver should be taken from every person claiming rights under the policy where the person's status as an insured would be affected by the coverage question.*

*C. Additional Defenses*

***If additional policy defenses are discovered during the course of the investigation, an additional non-waiver should be secured.*** *The new non-waiver should include all previouspolicy defenses still applicable, plus any new policy defenses.*

*D. How to Take a Non-Waiver*

***Obtaining the non-waiver in person is the preferred method to notify the insured of coverage questions.*** *This method provides the opportunity of meeting with the insured or any other party seeking protection under the policy and explaining why the non-waiver is necessary. We can show the policy to the insured and explain where the non-waiver language was obtained. The insured has an opportunity to ask questions. It should be emphasized to the insured that they are not waiving any rights under the policy by signingthe non-waiver agreement. It is the responsibility of the claim specialist to obtain the non-waiver.*

*V. RESERVATION OF RIGHTS LETTERS*

***If the insured refuses to sign the non-waiver*** *or if it is not feasible, the claim specialist should do the following depending on the nature of claim involved.*

*A. First-Party Claim*

*Inform the insured that the investigation will and they will receive a Reservation of Rights letter. Notify the TM who will be responsible for issuance of a Reservation of Rights letter, which will have the same effect as a nonwaiver.*

…

*The non-waiver should be worded in such a manner the insured can readily identify the appropriate policy language involved. Indicated below is an illustrative list of*

*reasons forobtaining the non-waiver.*
...

*When sending a Reservation of Rights letter, the exact policy language should also bequoted.*

Reservation of rights (ROR) letter outlining all coverage defenses identified must be issued immediately upon identification, and prior to the continuation of the investigation and handling of the claim. Reservation of rights letters must **clearly and fairly inform** the policyholder of the specific policy defense(s) identified, should be clear, concise, complete, and never contain inapplicable policy provisions. Policyholders must be notified of all policy defenses as soon as they are identified so that they may take steps to protect their interests or respond with information showing how the policy defense(s) identified do not apply to the claim. Policyholders must be given an opportunity to correct any real or perceived short comings, such as an assertion that the policyholder has failed to cooperate or mitigate damage.

Here is what the industry teaches its adjusters regarding RORs[9]:

***Claims Operations: A Practical Guide***

*© 2000-2015 International Risk Management Institute, Inc. (IRMI). All rights reserved.*
*Reservation of Rights Letter*

*A reservation of rights letter (sometimes referred to as an "R of R letter") reserves the insurer's right to deny coverage and/or withdraw from the defense of the claim at a future date. The letters should be comprehensive and cite* ***all the applicable policy language****, including the insuring agreement, definitions, exclusions, exceptions, and conditions. The letters should always be sent certified mail, return receipt requested, with a separate letter to the named insured, along with a copy to the insurance agent or broker as well as the applicable additional insureds requesting coverage under the policy, if that's the case.* ***The reservation of rights letter should be sent as soon as the adjuster is in a position to formulate a coverage opinion. This should be no longer than 30 days from the initial claim report date*** *or receipt of the summons and complaint. Be careful in the issuance of reservation of rights letters and know the jurisdiction and state laws. Here are some important points relative to reservation of rights letters:*

Here are some important points relative to reservation of rights letters:

- ***Failure to cite the applicable policy language, or issuance of an ineffective letter, may result in a flawed defensible coverage position, resulting in the waiver of coverage defenses and being estopped from raising any other future coverage defenses.*** *For example, a claim is submitted 6 months after the loss, but the driver is not listed on the policy, or is specifically excluded as a driver. If the initial coverage position letter indicated that the insurer was reserving its rights under the policy because the vehicle*

[9] Claims Operations: A Practical Guide © 2000-2015 International Risk Management Institute, Inc. (IRMI). All rights reserved.

*operator was not listed as a driver or was an excluded driver but failed to raise the "late notice" issue, the insurance company may be precluded, or "estopped" from raising the late notice issue at a later date.*

- *Some states require specific language on all reservation of rights letters, such as mandatory fraud language warning the policyholder of the consequences of submitting a fraudulent claim or their rights to submit a complaint to the state insurance department if they disagree with a coverage denial.*
- *Some states require the reservation of rights letters to be signed and acknowledged by the insured and will not uphold unilateral reservation of rights letters. A unilateral reservation of rights letter means that the letter is written by the insurance company or claim facility to protect its rights under the policy and is then sent to the policyholder. The policyholder's rights may not be protected in the letter as it was written by one party, and then signed by the insurer or claim facility. A nonwaiver agreement would be considered bilateral, as it protects both the insurance company and the policyholder and is signed by both parties.*
- ***A late reservation of rights letter could result in a waiver of any policy defenses.***
- *In some states, a reservation of rights letter triggers the insured's right to retain its own counsel to defend the insured for the noncovered causes of action, i.e., detailed allegations within a writ, petition, or complaint.*

***A reservation of rights letter is not forever!*** *Claims adjusters must eventually take a coverage position to accept coverage, partially deny coverage for certain aspects of the claim only or deny coverage for the total claim.*

As one example, here is how a typical insurer instructs it adjusters regarding conducting a coverage evaluation, and what to do when a coverage defense is identified.

> *B. Coverage*
>
> *All Lines*
>
> *It is **the primary responsibility** of the claim handler **to correctly verify, analyze and apply coverage.** Every claim should have a comment **in the initial file notes** regarding the applicability of coverage or any known coverage questions. When appropriate, a written coverage analysis should be placed in the file. Comments should include not only why there may be no coverage, but also why coverage exists. **It is the duty of the claim handler to attempt to find coverage for the insured.***
>
> *Coverage questions should be discussed with a manager or Vice President. **The insured and producer should be promptly informed of any coverage questions. This should be followed up with a Reservation of Rights and/or a Non-Waiver document;** and these documents should be approved by the manager prior to issuance. **All coverage questions should be resolved as quickly as possible while keeping both the insured and producer informed. Failure to promptly and properly address coverage questions could result in the payment of losses that are not covered or non-payment of covered losses.** A claim manager should approve any referrals to outside legal counsel for a coverage opinion. Written coverage*

> *denials must have the approval of a claim manager and Claim VP prior to the denial being issued.* ***All denials should be sent to the insured with a copy faxed or emailed to the producer, after prior phone discussion with the producer.*** *Claim officer approval is also required prior to filing any Declaratory Judgment actions.*

Obtaining a non-waiver agreement and/or reserving rights under a policy prior to conducting any additional investigation once a coverage issue is discovered is one of the most basic and important insurance industry claim handling standards.

Reservation of rights letters should be concise and clearly explain all coverage defenses identified and explain how those defenses apply to the claim at issue. Superfluous exclusions and limitations that the insurer has no intention of asserting or that do not apply should not be included. A ROR should not be a regurgitation of the entire policy, and the ROR is required to be error free, well thought-out, and effectual. Ineffectual or confusing ROR's containing superfluous policy provisions may result in a waiver of all policy defenses in certain jurisdictions. Reserving rights under a policy of insurance may also trigger an insurer's obligation to provide its insured with independent counsel (of the insured's own choosing) to defend any third-party lawsuit due to the conflict of interest such letters can create. If an insurer has no intention of disputing coverage, reserving rights is ill advised. Here is another example of how the National Flood Insurance Program ("NFIP") instructs its adjusters:

L. NON-WAIVER AGREEMENT[10]

*When the adjuster identifies a problem that could affect coverage or result in denial, a nonwaiver agreement must be secured from the insured. Failure to secure a non-waiver agreement might hinder the company from denial of claim when denial would be in order.*

*Examples of circumstances that require a non-waiver agreement include the following:*

*1. The policy has lapsed in coverage.*
*2. By action of the insured, the policy has become void.*
*3. More than one building is on a policy (except when scheduled), or there is more than one building at the property address. (Blanket coverage is not provided under the SFIP.)*
*4. The address of the risk is different from that listed on the policy.*
*5. The insured has not complied with the policy requirements.*
*6. Possibility of fraud.*
*7. Late reporting.*
*8. Any other situation for which the adjuster believes that a non-waiver agreement is needed.*

*In the event a non-waiver cannot be obtained in a timely manner, a detailed Reservation of Rights letter must be sent to the policyholder.*

*E. Reservations of Rights and Non-Waiver Agreements*[11]

[10] NFIC Claim Manual - BASIC ADJUSTMENT ISSUES VII-4 REVISED JUNE 2010.
[11] Insurance Committee For Arson Control. Page 16.

*Another important tool for insurers is the proper use of reservation of rights letters and non-waiver agreements. It is important to understand these two documents are not synonymous or equal. A non-waiver agreement is generally a standard form signed very early after the loss occurs by the insured. The advantage is the non-waiver is a signed document, so there is no doubt it was received by the insured and ostensibly read by him/her. Unfortunately nonwaiver agreements do not normally identify or contain specific information regarding the facts of the loss or what specific coverage or claim questions are being investigated.*

*In contrast,* ***a reservation of rights letter*** *under most state laws* ***must be detailed and must specifically be sent to the insured notifying him/her of the exact issues and concerns identified by the insurance carrier that may affect his/her coverage under the policy.*** *Such letters may even cite specific policy language at issue. Insurance employees who believe the purpose of the reservation of rights letter is to protect the company are viewing the use of a reservation of rights improperly. Instead of existing to protect the company,* ***a well-written reservation of rights letter should fairly and unequivocally place the insured or claimant on notice as to what issues, problems, and concerns have been identified with the claim and what specific sections of the policy may be at issue in determining whether coverage is due and owing.***

*Failure to properly use a reservation of rights letter and/or non-waiver agreement may be evidence of bad faith and may lead to paying a claim for which coverage may never have been due and owing. It is equally necessary to understand the importance of a well-written reservation of rights letter, as one that contains inaccurate or false information may be evidence of bad faith while a balanced and fair reservation of rights may be the company's best evidence of showing from the start how the claim investigation was handled with utmost good faith.*

*One final point for insurers to consider is each reservation of rights is not to be issued unilaterally, but as a mutual reservation of rights. Simply changing the language ever so slightly, it is important to note to the insured or claimant the company is reserving its rights, but also recognizing fully all rights and interest under the policy of the insured or claimant are equally protected and reserved to the insured's or claimant's interests as well.*

**DENIALS**

A denial should only be issued as a last resort, and only after attempting to read-in coverage. A denial should never be considered unless or until a prompt, full and thorough investigation has been conducted under a reservation of rights. If after conducting a full and thorough investigation, there is no reasonable path to coverage, a clear, concise, and accurate written denial letter should be issued timely, citing all bases. As with ROR letters, any applicable policy defense not cited in the denial letter that an insurer knew or should have identified at the time of the denial, had it conducted the required full and thorough investigation, may be waived. A denial letter must be correct and accurate the first time.

As with reservation of rights letters, denial letters must be complete, accurate, and clearly and

fairly inform the policyholder of **the specific policy defense(s)** upon which coverage is being denied, and how those policy defense(s) apply to the policyholder's claim. As with reservation of rights letters, denial letters must not contain inapplicable policy defenses.

Insurance companies have an obligation to only deny claims when a policy defense can be concretely proven, and denials should never be based on speculation or conjecture. The policyholder has a right to understand why its claim is being denied and must be given an opportunity to respond with reasons or information showing why the policy defense(s) asserted are inapplicable.

Upon receipt of a request for reconsideration, or new information, the insurance company must thoughtfully reevaluate its position, and if necessary, promptly investigate any new information to the extent necessary, while looking for a path to coverage. The insurance company must then respond timely to the request for reconsideration, and clearly and fairly inform the policyholder of its findings.

When investigating claims, adjusters must guard against tunnel vision. That is, adjusters must give all evidence and information equal weight, and not focus solely on the negative. **Insurance Companies must view details in a manner leading to coverage, not to coverage controversy.**

In Donna J. Popow's book, Claims Handling Principles and Practices, a book use to teach the Associate In Claims 30 curriculum, published by the Institutes, the author states:

***"An adjuster should: "devote an equal effort to proving the insured's innocence and determining the amount of the claim." A failure to do so "might result in the claim being improperly denied." "However, developing evidence of the insured's innocence is an excellent outcome*** *for an arson investigation.* ***Unfortunately, some insurers have become so fixated*** *on evidence of a deliberate fire that they have completely overlooked that the insured had no motive to commit arson and would suffer significant financial harm even with a full insurance settlement."*

## CLAIM HANDLING DURING LITIGATION[12]

Regardless of a claim being a first party claim resulting in a lawsuit directly against the insurer by its policyholder, or a claim involving a 3rd party lawsuit against the insured, the claim handler remains in full control of the claim process during litigation, while overseeing and directing the litigation process to ensure compliance with claim handling standards. An adjuster must never cede claim handling to retained counsel.

Adjusters are required to handle claims with an eye towards the best interest of the insured, whereas retained counsel is trained to be a zealous advocate of its client. Therefore, where an insurer is defending itself from a lawsuit filed by the insured, it is important for the adjuster to make sure that the claim is constantly being reevaluated during the litigation process, and that settlement is pursued when appropriate. Advice of counsel must be evaluated to separate legal or technical defenses from doing what's right to protect the policyholder in accordance with the

[12] Claims Operations: A Practical Guide Appendix: Litigation Management.

terms of the policy and insurance industry standards.

Adjusters must be cautious when attempting to apply exclusions in an overly broad manner and must not attempt to assert policy defenses that are not remotely related to the claim.

Where coverage disputes arise, the insurer must split claim handling, assigning a second adjuster to the claim, with one assigned to address coverage, and the other assigned to defend the interests of the insured, and to continue to properly handle the claim in accordance with industry standards. A so-called Chinese Wall[13] must also be established so that the two assigned adjusters cannot discuss the claim with one another or access each other's claim file or claim file notes.[14] When a conflict arises due to a coverage defense being asserted, independent counsel should be assigned to defend the insured so that there is no appearance of impropriety or conflict of interest, and defense counsel should never become involved in coverage disputes or give coverage advice.

Legal expense must be closely monitored, and bills paid timely after review. Where non-panel counsel is retained, the insurer must reach some understanding regarding hourly rates and billing practices. Insurers should never expect to hold independent counsel or non-panel firms to the same billing standards and rates as panel counsel, since panel counsel billing guidelines are negotiated with the understanding that the firm will receive multiple cases in exchange for a volume discount. When billing disputes arise, the adjuster must contact the attorney and reach some agreement immediately rather than merely refusing to pay invoices and allowing the dispute to fester.

In Donna J. Popow's book, AIC 30 Claim Handling Principles and Practices 1st Edition, the author explains:

*Page 2.38 – "…claim representatives participate in developing a litigation strategy for the insured's defense…"*

*"Claim representatives must carefully select and direct defense lawyers. The lawyers role is to be the insured's advocate; he or she must address every aspect of the claimant's case, from liability to damages, to mitigate the claim against the insured and to encourage the claimant to settle out of court."*

*Page 8.19 "The claim representative's responsibilities in handling the claim continue after the claim has been referred to defense counsel."*

*"The claim representative should be involved in all aspects of the defense, including assessment, and attempts to resolve the claim."*

*"Communication between defense counsel and the claim representative throughout the litigation process is essential."*

---

[13] IRMI Expert Commentary Insurance … The Other Side of the Chinese Wall.
[14] Session 31 - Ethics - The Great Divide.

*Page 9.10 – "Thus, excess insurers have an interest in how primary insurers handle claims presented against the underlying policy."*

*"An excess insurer can pursue a bad faith claim against a primary insurer through equitable subrogation or through a direct action."*

*"…an excess insurer has the same rights as an insured to bring a claim against an insurer because it is harmed in the same way an insured is harmed by a judgment in excess of the primary policy limits. The excess insurer is permitted to assume the role of the insured and allege bad faith, for example, if the primary insurer refused a demand to settle within policy limits."*

*"…an insurer should not be allowed to take chances with the excess insurer's money by risking an excess verdict. If courts impose on primary insurers a duty of care towards the excess insurer, then that duty encourages settlements, keeps premiums for excess insurance low, and creates no extra burden for the primary insurer, who is already under and obligation to settle the claim in the insured's interests."*

*"Claim representatives who learn that insureds or their insurer have excess insurance that could apply to a loss should document that information in the claim file and follow notice and reporting procedures associated with the excess policy."*

**Retention of Legal Counsel[15]**

*Each insurer will need to make its own decision concerning at what point in a claim investigation legal counsel should be consulted and involved in the loss. Carriers will also need to make the decision, as briefly discussed earlier, concerning whether it is appropriate to use house counsel or outside independent panel counsel to assist in a claim investigation or coverage decision. These are important decisions to make, and the vetting and approval of the appropriate counsel to assist in the claim investigation are equally if not more important than the selection of the correct origin and cause or other independent investigator.*

***It is equally crucial attorneys understand that their role*** *in the investigation is to gather correct and accurate information, and,* ***if coverage is due and owing, to notify the carrier promptly to proceed with payment of the claim.***

*If the attorney views his/her role in the claim investigation as trying to find a way for the insurance company to not pay the claim, then the company is operating in bad faith. To the contrary, the attorney should be the independent analyzer who advises the insurance company concerning the laws appropriate to the jurisdiction, and, based upon those laws and the information contained in the investigation, guides the company on the correct decision as to whether coverage should be extended or denied.*

[15] Insurance Committee For Arson Control. Page 19.

Here is how the book “Claims Operations: A Practical Guide” by Michael T. Murdock, MSIM, CPCU, ARM, ARe, ASLI, ACI, instructs adjusters regarding the importance of a complete and accurate Claim file and Claim File Notes in Chapter 11: Claims Process—Investigation and Adjustment

Claim File Documentation

*Proper claim file documentation is essential to effectively manage the claims process and also to comply with various state claims handling statutes and regulations. All claim file notes are placed in either the hardcopy claim file or within the electronic claim file, avoiding the use of telephone messages or handwritten "sticky" notes. All claim file mail and other correspondence should be date stamped, i.e., stamped with the date received, and then scanned to the claim file if an electronic file system is used. All correspondence pertaining to lawsuits or litigation, claims service complaints (including insurance department complaints), appraisals, and damage estimates is a priority and must be handled promptly.*

*The subsequent notes by the handling adjuster pertain to individual items completed during the investigation and adjustment process. At every diary review date, or when interim substantive file activity develops, all file notes should comment on the adequacy of the current claim reserves and outline the follow-up items required on diary.*

*All claim activities documented in the claim file notes need to be clear so that any person reviewing the claim file will know the status of the investigation and adjustment of the claim. The file notes should be concise, but understandable, and not be entered in an abbreviated or cryptic manner. When entering a file contact note, the date, time, full name of the party spoken with, the company name, their position, if applicable, and telephone number should appear in the file note.*

*All communication, discussions, and interaction between the handling adjuster and claims manager is clearly outlined within the claim file notes, including settlement, payable, and reserve authority. All claim settlement negotiations should be clearly documented in the claim file notes indicating demands and offers discussed during the negotiation process.*

*Typically, within 15 days from the assignment date, the handling adjuster should have completed most of the initial investigation. Thereafter, the handling adjuster completes claim status reports at various intervals during the claims handling process or at the request of management. Generally, claim status reports include the same information as the adjuster action plan; however, they may be revised or tailored depending on what stage the claim is in. The claim status report provides an explanation of where the claim currently stands, what has been done to date, and what needs to be done in the future.*

*During the initial 6 months of a claim, claim status reports are required at the 30-, 90-, and 180-day increments and include the same adjuster action plan items referenced above. The claims manager reviews all claims status reports, providing written comments and instructions as necessary in a note format, and further diaries the claim file in accordance with diary management requirements. Any necessary reserve adjustments should be either processed by the claims manager with an explanatory note to the handling adjuster within the claim file, or referred to the handling adjuster with specific instructions.*

*If the claim file is subject to client large loss reporting, the large loss report should replace the claim status report if the completion dates are within the same time period. A large loss report is a report to management or a client triggered by the reserves (or payments) exceeding a certain predefined level, or a certain type of claim requiring special reporting. The monetary trigger level will vary by company and can be start as low as $25,000. The report may be on a large loss reporting form, in electronic format, or in a word processing document. Large loss reports may be in a captioned report format, as well.*

*At every review date, the handling adjuster and claims manager need to comment on the adequacy of the current claim reserves. A claim reserve review is generally mandatory on all claim reserves open for 9 months from the initial report date. A case reserve is an estimate of the value of a claim or group of claims not yet paid; an estimate of the amount a particular claim will ultimately be settled for or adjudicated. Insurers will also set reserves for their entire books of business to estimate their future liabilities. See Chapter 16, for more information on reserving practices.*

*Justification for any reserve adjustments should be clearly documented within the claim file notes. If a factor reserve(Footnote 8) is being converted to a terminal reserve,(Footnote 9) the notes should reflect any special handling instructions regarding the reserve conversion.*

## DISPUTES OVER COST AND SCOPE

While an insurance company must give equal weight to evidence favoring coverage, or the insured's position, unless there is a compelling reason to give more weight to an insured's expert's opinion, the insurance company has the right to rely upon the opinions of its own expert(s), building consultants, and adjusters. To be clear, an insurance company has every right to dispute claims when it has a reasonable basis to do so, and nothing in the above standards and common practice should be read as taking away that right. The right to dispute claims hinges upon reasonableness.

While some suggest that the submission of an estimate developed by an insured's contractor is sufficient proof of loss to require claim payment, nothing could be further from the truth. Adjusters must vet such estimates, and estimates are often inaccurate, inflated, and sometimes contain cost and scope to repair property that is not covered, excluded, not damaged, or unrelated to the claim. Contractors don't understand or apply the parameters of coverage to their estimates, often go too far, inflate estimates, include items the insured may merely want updated or changed, and/or include pre-existing damage. Likewise, adjuster, building consultant, and engineer estimates are not always accurate, since it is very easy to overlook or miss damage, especially damage that is not visible, and some estimators can be very conservative in their approach. **In short, while an insurer's estimate establishes the undisputed amount of loss, the insured's contractor's estimate does not**, and no estimator should be viewed as infallible.

Estimates are just that, an estimate of what the estimator believes it will cost to repair or replace the damaged property in his or her opinion. Anyone that has ever built a home, structure, or even renovated a building can tell you that the initial **estimate** is rarely if ever the final cost. Insurance companies must therefore keep an open mind, and when competing estimates are submitted by an insured, the adjuster must reconsider the amount paid, **attempt** to reach an agreement with the

insured's contractor, and if necessary, reinspect the property or bring in a building consultant, or sometimes an engineer, to provide a professional opinion.

An adjuster is not an engineer, and therefore is not qualified to disagree with an engineer's findings, no more than a roofer or contractor can disagree with a certified engineer. The insurance company cannot disagree with an engineer's report unless there is a sound basis to do so, such as a clearly flawed opinion.

When provided with a report from an engineer retained by an insured, the standard practice is for the insurance company to retain its own engineer for a second opinion. Just as a Neurologist's opinion would be given deference over an Orthopedic surgeon's when evaluating a neurological complaint, or an attorney's opinion over a lay persons when evaluating the law, an engineer's opinion would be given greater weight than an adjuster's, contractor's, or a building consultant's, when evaluating structural damage.

While I have attempted to address some of the standards that are commonly at issue in litigated claims, there are many other insurance industry standards that apply to all facets of the insurance industry. While it is impossible to address them all here, hopefully this has been helpful to the reader.